**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
515 South Flower Street
18th and 19th Floors
Los Angeles, CA 90071
Tel: (213) 985-7290
Email: aapton@zlk.com

*Counsel for Plaintiff Daniel Kinnamon*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL KINNAMON, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>        v.<br><br>GOSSAMER BIO, INC. and FAHEEM HASNAIN,<br><br>                    Defendants. | Case No.  **'26 CV 2016 CAB AHG**<br><br>CLASS ACTION<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR JURY TRIAL |

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff Daniel Kinnamon ("Plaintiff"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Gossamer Bio, Inc. ("Gossamer" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Gossamer's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Gossamer securities between June 16, 2025, and February 20, 2026, inclusive (the "Class Period"), including securities acquired through assignments from selling put contracts, seeking to recover damages caused by Defendants' violations of the federal securities laws.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

2.      Defendants provided investors with material information concerning Gossamer's Phase 3 PROSERA study evaluating seralutinib for the treatment of pulmonary arterial hypertension (PAH). Defendants' statements included, among other things, confidence in PROSERA's trial design.

3.      Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating false and misleading statements and/or concealing material adverse facts concerning the study design for the Company's Phase 3 PROSERA study, particularly, controlling for the placebo response at the Latin American testing sites. This caused Plaintiff and other shareholders to purchase Gossamer's securities at artificially inflated prices.

4.      The truth emerged on February 23, 2026 when Gossamer published a press release and hosted a Special Call announcing topline results for its Phase 3 PROSERA study, which failed to meet the primary endpoint of improved six-minute walk distance (6MWD) at Week 24, with a +13.3 meter placebo-adjusted gain (p-0.0320) failing to meet the required 0.025 alpha threshold. Gossamer attributed this miss to patients at Latin American sites performing particularly well on placebo due to enrollment of a heavily-treated lower-risk population.

5.      As a result, investors and analysts reacted immediately to Gossamer's revelation. The price of Gossamer's common stock declined from a closing market price of $2.13 per share on February 20, 2026 to $0.42 per share on February 23, 2025, a decline of over 80% in the span of just a single day.

2

6.      Investors have sustained significant damages as a result of Defendants' fraudulent statements. Plaintiff seeks to recover those damages by way of this lawsuit.

## JURISDICTION AND VENUE

7.      Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

8.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

10.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant Gossamer is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

11.      In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

3

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## THE PARTIES

12.    Plaintiff purchased Gossamer common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in Gossamer is attached hereto.

13.    Gossamer Bio, Inc. is a Delaware corporation with its principal executive offices located at 3115 Merryfield Row, Suite 120, San Diego, CA 92121. During the Class Period, the Company's common stock traded on the NASDAQ Stock Market (the "NASDAQ") under the symbol "GOSS."

14.    Defendant Faheem Hasnain ("Hasnain") was, at all relevant times, the Chief Executive Officer, Chairman, and Co-founder of Gossamer.

15.    Defendant Hasnain is sometimes referred to herein as the "Individual Defendant." Gossamer together with the Individual Defendant are referred to herein as the "Defendants."

16.    The Individual Defendant, because of his position with the Company, possessed the power and authority to control the contents of Gossamer's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of his

4

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

position and access to material non-public information available to him, the Individual Defendant knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendant is liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendant.

17.   Gossamer is liable for the acts of the Individual Defendant, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful act complained of herein were carried out within the scope of their employment with authorization.

18.   The scienter of the Individual Defendant, and other employees and agents of the Company are similarly imputed to Gossamer under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### A.   Company Background

19.   Gossamer is a clinical stage biopharmaceutical company focused on the development and commercialization of seralutinib for the treatment of pulmonary hypertension (PH) associated with interstitial lung disease.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**B.    Defendants Materially Misled Investors Concerning the Company's Phase 3 PROSERA Study**

*June 16, 2025*

20.    On June 16, 2025, Gossamer published a press release announcing the completion of enrollment in the Company's registrational Phase 3 PROSERA study for the treatment of PAH. Defendant Hasnain stated, in pertinent part:

> Completing enrollment for the Phase 3 PROSERA Study represents an important step forward in our mission to develop seralutinib as a potential first-in-class treatment option for PAH. We are deeply grateful to the patients, caregivers, and investigators who made this possible through their dedication and partnership.
>
> Building on insights from the Phase 2 TORREY Study, we focused on selecting a patient population that aligns closely with the study's objectives and is more likely to exhibit a clinically significant benefit in 24 weeks. Given the preliminary baseline characteristics of PROSERA, we firmly believe that we have accomplished this patient selection goal. We are eager to be able to share topline results from this registrational study early next year.

*August 5, 2025*

21.    On August 5, 2025, Gossamer published a press release announcing second quarter financial results and provided a business update. Defendant Hasnain provided an update on the Phase 3 study, in relevant part:

> It is an exciting time at Gossamer. We are currently well underway with commercial planning for seralutinib, in partnership with Chiesi Group, as we prepare to evolve from a clinical-stage biotech into a commercial organization. Additionally, we are preparing for the initiation of a global, registrational Phase 3 clinical study in PH-ILD, the SERANATA Study, for which we expect to activate the first clinical sites in the fourth quarter of this year.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*And while our potential first-in-class therapeutic, seralutinib, represents the possibility of a multi-billion-dollar opportunity across multiple indications, we recognize the unique significance of the upcoming pivotal readout in PAH as the foundation to that potential franchise. Our team remains duly focused on executing the PROSERA Study with discipline and operational excellence, grounded in our conviction around the strength of the science and the seriousness of the unmet need in PAH. We look forward to sharing topline results in February.*

(Emphasis added.)

*November 5, 2025*

22.     On November 5, 2025, Gossamer published a press release announcing third quarter financial results and provided a business update. Defendant Hasnain provided an update on the Phase 3 study, in pertinent part:

We are proud to be progressing through the final stages of the PROSERA Phase 3 Study. This is a pivotal moment for our team, and I am continually impressed by the focus, diligence, and professionalism that everyone brings to this important work. We look forward to sharing top-line results with the community in February of next year.

23.     The above statements in Paragraphs 20 to 22 were false and/or materially misleading. Specifically, Defendants knew or recklessly disregarded the trial design issues with Gossamer's Phase 3 PROSERA study. In fact, Defendants misled and deceived investors by crafting a narrative that Phase 3 PROSERA would meet its primary endpoint. Defendants failed, however, to disclose that patients at the Latin American sites were largely heavily-treated and lower risk and, ultimately, performed particularly well on the placebo, thus, Gossamer's Phase 3 PROSERA

7

study failed to meet the primary endpoint of improved six-minute walk distance at week 24.

### C.    The Truth Emerges

*February 23, 2026*

24.    On February 23, 2026, Gossamer published a press release and hosted a Special Call announcing the topline results from its Phase 3 PROSERA study. Defendant Hasnain stated, in pertinent part:

> While we are disappointed to have narrowly missed the stringent prespecified statistical threshold for our primary endpoint, the result still clears the traditional 0.05 p-value, and we believe these data clearly demonstrate seralutinib is an active drug in patients with PAH.

> We are also pleased by the clinically meaningful improvements observed in intermediate- and high-risk patients who are at an increased risk of significant morbidity and mortality events and represent a population with a high unmet need. From a clinical development perspective, this is not a narrow or exploratory finding. Seralutinib has once again demonstrated a statistically robust and clinically meaningful signal in higher-risk patients, consistent with the TORREY Study, which is a clearly defined and readily identifiable population. This finding is compelling on its own.

> Altogether, these data support the conclusion that seralutinib demonstrated greater activity in patients with more advanced disease. This is even more impressive given how heavily treated the PROSERA population was, including 55% of patients on triple or quadruple background PAH therapy and 61% on background prostacyclin therapy.

> We are deeply grateful to the patients, investigators, and clinical teams whose participation made this study possible. Given the significant unmet need in PAH, and seralutinib's differentiated, nonvasodilatory mechanism, we believe these results warrant further discussions with the FDA regarding a potential path forward.

25.    During the Special Call, Gossamer's Chief Medical Officer, Richard Aranda, stated in relevant:

Here, we put the PROSERA placebo performance into context. As you can see, in PROSERA, the placebo arm showed a larger improvement that is often seen in many other Phase III PH trials where placebo frequently remains near baseline or declined slightly over time. The unusually strong placebo improvement in PROSERA reduced the placebo-adjusted difference and is an important factor in interpreting why a numerically positive effect did not clear the prespecified statistical bar.

***To further understand our placebo response, we evaluated the placebo response by prespecified geographic region groupings and noted it differed across the regions. In North America, the placebo performance was more aligned with typical modern PH trials and the overall treatment effect was most pronounced with a 25.9-meter placebo-adjusted improvement in 6-minute walk distance. In other regions, particularly Latin America, outsized placebo improvements materially compressed the pool treatment difference.***

(Emphasis added).

26.    As part of the associated Special Call, Gossamer management responded to analyst questions during a question-and-answer segment, in pertinent part:

<Q: Andreas Argyrides – Oppenheimer – Analyst> I was hoping for more clear-cut results here, but clearly an active drug. Just if you can give us a little bit on the placebo response here, just how the geographical breakdown compared to expectations at the time of enrollment? And then I have one follow-up.

9

<A: Bryan Giraudo – COO & CFO> Yes. So I think, Andreas, you recall that we made a significant investment in Latin America following the very, very significant results that we saw in the STELLAR study for sotatercept, where that was a geography that patients benefited the most. ***So certainly, for us to see an almost parity between the placebo rate and the treatment rate and how the statistical plan using Hodges-Lehmann works where that ended up reducing the treatment effect by 8 meters.***

***So adding 8 meters on the placebo side was extremely, extremely disturbing to our team because, again, we expected to have an effect that has been seen in most PAH studies where Latin America is the best performing geography. We're still early in the investigation of what happened in Latin America, and we certainly will have more to come as we continue that work.***

And even in other geographies, we saw a higher-than-normal placebo rate. Importantly, in the places where PAH treatment has been quite frankly, the most mature in North America and Western Europe, Australia, we are seeing what would be historically comparable placebo rates. So certainly, there is something that happened in Latin America. We have to understand it, and we will obviously engage not only with the investigators there, their sites as well with PPD who you recall was also CRO that did the STELLAR study. So more to come, but that was probably the most surprising and disappointing finding. Faheem?

<A: Faheem Hasnain – CEO> ***Yes, Paul. What's really fascinating about what happened in Latin America, we saw a substantial number of super responders on placebo with over 100-meter walk improvements, which is really kind of quite fascinating.*** But what I think is really interesting, which really shows the impact of this drug is that over time, we start to see a separation. Even though we had that substantial placebo effect, as we look at the Latin America data out to week 48, we actually see improvement on the drug arm, just to give you kind of a sense, when we do an apples-to-apples comparison, the placebo effect starts to catch up on these patients at week 48. So they have a 40-meter improvement on placebo at week 48, that drops to 15 meters. But the drug effect goes from a 50-meter improvement up to a 66-meter improvement.

10

So you start to see the separation of placebo and drug over time. And we think that might be related to and consistent with what we see in the less sick patients that as we're affecting physiological -- having those physiological effects in the lung and the heart, the sicker patients will take a little longer for that response to occur. And we saw that in TORREY, and we seem to be seeing it here again.

<A: Bryan Giraudo> So what we need to do, Andreas, is really unpackage where, in fact, those patients that were enrolled in Latin America, a REVEAL Lite 5 or greater, it's obviously disappointing. It's obviously extremely frustrating, and it is incumbent upon the Gossamer team with our friends at PPD and Chiesi to understand what happened because this result and all of our KOL thought partners upon seeing this were stunned by what happened in Latin America.

\*     \*     \*

<Q: Laura Kathryn Chico - Wedbush Securities – Analyst> So one more on the placebo response. Slide 9, you had that great picture of 6-minute walk distance placebo results from other studies at week 24. Do you have any sense as to how the week 48 placebo responses for other programs might fare? And I guess I'm just trying to understand if the week 48 placebo response you're seeing is also elevated or if that is more in line with what we would be expecting from other trials? And then just a housekeeping question. The PVR data was not collected in PROSERA, correct?

<A: Bryan Giraudo> So PVR was not collected. In regards to other studies, 48 weeks, not a lot of folks did what we did, where you kept placebo-controlled data to week 48, it would be really an apples and oranges comparison because you'd be comparing it to open-label extension data, right? So for example, in the sotatercept data sets, most of their 6-minute walk data is open label.

We were one of the first sponsors to go out to week 48 on a placebo-controlled basis. But what we can say is across all geographies over time, placebo starts to behave normally, specifically, as Faheem said, in Latin America, where when you look at those patients that had a week 24 walk and stayed in the study to week 48, which is roughly about 29 or 30 patients, you see placebo at week 48 starting to behave like you would have expected. So I also believe that, that week 48 data is another important pillar for our discussions with regulators because

11

it starts to meter out the placebo effect and also continues to show continued improvement for patients on drug.

So ultimately, we do think that, that week 48 endpoint is really, really important for our ability to say this drug has an important place in the marketplace for patients because of that long-term efficacy. And again, that placebo effect starting to normalize longer term.

(Emphasis added).

27. The aforementioned investor presentation and statements made by the Individual Defendant was misleading and in direct contrast to statements made in his previous press releases and presentations. In his previous statements, Defendant made no mention of issues with the Phase 3 PROSERA trial design in Latin America.

28. Analysts expressed surprise and concern at the Company's primary endpoint miss. In particular, on February 24, 2026, Wedbush published a report downgrading Gossamer to Neutral and decreasing the Company's price target to $1 from $6. The report states, in pertinent part:

PROSERA falls short of expectations. GOSS reported Phase 3 PROSERA data for seralutinib in pulmonary arterial hypertension (PAH). Most notable –the study failed to meet the primary endpoint on median change in 6-minute walk distance at 24 weeks for seralutinib vs. placebo. The seralutinib group demonstrated a +28.2m improvement from baseline, while placebo achieved +13.5m improvement (effect = +13.3m, p=0.0320). This was above the prespecified threshold of 0.025. Management noted unusual placebo performance, particularly among Latin America and Asia/Middle East regions. GOSS noted historic Phase 3 placebo responses varied (-9m to +11m).

29. Similarly, on March 5, 2026, Oppenheimer published a report reducing Gossamer's price target to $3 from $12 and stating, in relevant part:

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

The data irregularity in Latin America is a trial execution issue, not a drug effect issue, as every other region demonstrated a clear treatment benefit. The irregularity is specifically the absence of a treatment effect on top of the placebo—not an unusually large placebo response—which KOL believes points to human measurement error during 6MWD lap counting. Gossamer is conducting a data review investigation.

30.    As a result, investors and analysts reacted immediately to Gossamer's revelation. The price of Gossamer's common stock declined from a closing market price of $2.13 per share on February 20, 2026 to $0.42 per share on February 23, 2025, a decline of over 80% in the span of just a single day.

**D.    Additional Scienter Allegations**

31.    During the Class Period, Defendants acted with scienter in that they knew or otherwise were deliberately reckless in not knowing that the public statements disseminated on behalf of Gossamer were materially false and misleading at the time they were made. Defendants had actual knowledge of, or access to, non-public information concerning the trial design and clinical test site selection as the drug sponsor, thereby knowing or recklessly disregarding the protocol design issues that ultimately caused the Phase 3 PROSERA study to fail to meet its primary endpoint of improved six-minute walk distance at week 24.

32.    In fact, Defendants knew or deliberately disregarded that patients at the Latin American clinical testing sites were largely heavily-treated as well as lower risk and, therefore, performed particularly well on the placebo. Defendants knew or deliberately disregarded these issues that gave rise to the acute risks that ultimately

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

materialized and caused the trial to fail. Despite such knowledge, Defendants repeatedly conveyed a positive outlook to investors and constructed a narrative that the Phase 3 PROSERA trial would meet its primary endpoint.

### E.    Loss Causation and Economic Loss

33.    During the Class Period, as detailed herein, Gossamer and Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Gossamer's securities and operated as a fraud or deceit on Class Period purchasers of Gossamer's common stock by materially misleading the investing public. Later, when Gossamer and Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Gossamer's securities materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Gossamer's securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

34.    Gossamer's stock price fell in response to the corrective event on February 23, 2026, as alleged *supra*. On February 23, 2026, Defendants disclosed information that was directly related to their prior misrepresentations and material omissions concerning the Phase 3 PROSERA trial's defects in Latin America.

### F.    Presumption of Reliance; Fraud-On-The-Market

35.    At all relevant times, the market for Gossamer's securities was an efficient market for the following reasons, among others:

14

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(a)    Gossamer's securities met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

(b)    Gossamer communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)    Gossamer was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)    Unexpected material news about Gossamer was reflected in and incorporated into the Company's stock price during the Class Period.

36.    As a result of the foregoing, the market for Gossamer's securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in Gossamer's stock price. Under these circumstances, all purchasers of Gossamer's securities during the Class Period suffered similar injury through their purchase of Gossamer's securities at artificially inflated prices, and a presumption of reliance applies.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

37. Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### G.    No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine

38. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with statements about regulatory developments and prospects while at the same time omitting acute risks undermining the validity of their statements.

39. To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

40. Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was

16

made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Gossamer who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

41. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Gossamer's securities during the Class Period, including securities acquired through assignments from selling put contracts (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

42.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Gossamer's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Gossamer or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of October 31, 2025, there were 231.5 million shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

43.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

44.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

45. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Gossamer;

(c) whether the Individual Defendants caused Gossamer to issue false and misleading financial statements during the Class Period;

(d) whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e) whether the prices of Gossamer's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

46. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Against All Defendants for Violations of*
### *Section 10(b) and Rule 10b-5 Promulgated Thereunder*

47.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

48.    This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

49.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Gossamer common stock; and (iii) cause Plaintiff and

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

other members of the Class to purchase or otherwise acquire Gossamer's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

50.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Gossamer's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

51.    By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

21
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

52.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior manager and/or director of the Company, the Individual Defendants had knowledge of the details of Gossamer's internal affairs.

53.    The Individual Defendant is liable both directly and indirectly for the wrongs complained of herein. Because of his position of control and authority, the Individual Defendant was able to and did, directly or indirectly, control the content of the statements of the Company. As officer and/or director of a publicly-held company, the Individual Defendant had a duty to disseminate timely, accurate, and truthful information with respect to Gossamer's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Gossamer's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Gossamer's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

54.    During the Class Period, Gossamer's common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Gossamer's common stock at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Gossamer's common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Gossamer's common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

55.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

56.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## COUNT II

### *Against the Individual Defendants*
### *for Violations of Section 20(a) of the Exchange Act*

57.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

58.    During the Class Period, the Individual Defendant participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of his senior position, he knew the adverse non-public information about Gossamer's misstatements.

59.    As officer and/or director of a publicly owned company, the Individual Defendant had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Gossamer which had become materially false or misleading.

60.    Because of his position of control and authority as senior officer, the Individual Defendant was able to, and did, control the contents of the various reports, press releases and public filings which Gossamer disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendant exercised his power and authority to cause Gossamer to engage in the wrongful acts complained of herein. The Individual Defendant therefore, was a "controlling person" of the Company within the meaning

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

of Section 20(a) of the Exchange Act. In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of Gossamer's common stock.

61.    The Individual Defendant, therefore, acted as a controlling person of the Company. By reason of his senior management position and/or being director of the Company, the Individual Defendant had the power to direct the actions of, and exercised the same to cause, Gossamer to engage in the unlawful acts and conduct complained of herein. The Individual Defendant exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

62.    By reason of the above conduct, the Individual Defendant and/or Gossamer are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

C.      Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: March 31, 2026                    Respectfully submitted,

**LEVI & KORSINSKY LLP**

*/s/ Adam Apton*

Adam M. Apton (SBN 316506)
Email: aapton@zlk.com
515 South Flower Street
18th and 19th Floors
Los Angeles, CA 90071
Tel: (213) 985-7290

*Attorneys for Plaintiff Daniel Kinnamon*

26
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS