Laurence M. Rosen, Esq. (SBN 219683)
Jonathan Horne (*pro hac vice*)
Yitzchok Fishbach (*pro hac vice*)
**THE ROSEN LAW FIRM, P.A.**
Email: lrosen@rosenlegal.com
Email: jhorne@rosenlegal.com
Email: yfishbach@rosenlegal.com
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610

*Counsel for Lead Plaintiff and the Class*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MARTIN MEIENHOFER, MIKE FLEMING, and PETER ZECH, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>GOSSAMER BIO, INC., FAHEEM HASNAIN, and BRYAN GIRAUDO<br><br>Defendants. | Case No: 3:26-cv-02016-CAB-AHG<br><br>AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><u>CLASS ACTION</u><br><br>Judge: Hon. Cathy Ann Bencivengo<br><br>JURY TRIAL DEMANDED |

# TABLE OF CONTENTS


**I. NATURE OF THE ACTION ........ 1**

**II. JURISDICTION AND VENUE ........ 5**

**III. PARTIES ........ 6**

**IV. DEFENDANTS' MISCONDUCT ........ 7**

**A. Background ........ 7**

**1. PAH and Key Metrics ........ 7**

**2. Defendants Claim to Learn TORREY's Lesson ........ 10**

**3. Enrollment procedure ........ 15**

**4. PAH Rarity and Clinical Trials ........ 16**

**5. Gossamer Goes All in on One Site in Brazil ........ 19**

**6. Low Failure Rates ........ 22**

**7. Healthy patients red flag ........ 23**

**8. New patient red flag ........ 28**

**9. FDA guidance instructs sponsors to monitor for such red flags ........ 29**

**10. The Porto Alegre Clinic Had the Potential To Throw Off the Entire PROSERA Trial ........ 30**

**11. 27 Patients From One Clinic Was Suspicious Because It Is Well Known That Patients and Clinics Have Incentives to Participate In Clinical Trials ........ 32**

**B. Loss Causation ........ 37**

**C. Defendants' Materially False and Misleading Statements and Omissions ........ 39**

**D. Additional Facts Further Probative Of Scienter .....................................45**

**1. Defendants deliberately decided to focus on the Porto Alegre clinic so they would be familiar with its operations .......................45**

**2. Defendants evinced familiarity with the data underlying the red flags ..........................................................................................46**

**3. Defendants Evinced familiarity with the details of PROSERA....49**

**4. Defendants Had a Financial Motive to Accept the Porto Alegre Clinic's Otherwise Implausible Results .........................................50**

**5. The Fraud Implicated Core Operations ........................................53**

**6. Gossamer Was a Small Company...................................................54**

**V. NO SAFE HARBOR.......................................................................... 56**

**VI. THE CLAIMS ARE TIMELY ........................................................... 56**

**VII. PRESUMPTION OF RELIANCE....................................................... 57**

**VIII. LEAD PLAINTIFFS' CLASS ACTION ALLEGATIONS ................... 58**

**COUNT I.................................................................................................. 61**

**COUNT II ................................................................................................ 64**

**IX. PRAYER FOR RELIEF ................................................................... 65**

**X. DEMAND FOR TRIAL BY JURY..................................................... 65**

1. Lead Plaintiff Martin Meienhofer and Named Plaintiffs Mike Fleming and Peter Zech, individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against Defendants (defined below), allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters.

## I. NATURE OF THE ACTION

2. This is a federal securities class action brought on behalf of all persons and entities other than Defendants who purchased or otherwise acquired Gossamer equity securities between May 16, 2025, and February 20, 2026, inclusive (the "Class Period"), and held such shares through February 20, 2026, seeking to recover damages caused by Defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").

3. The Phase 2 results for Gossamer's drug seralutinib to treat pulmonary arterial hypertension ("PAH"), TORREY, disappointed investors because it failed to show statistically significant improvement in the distance a patient could walk in 6 minutes. But Defendants told investors that a subgroup of sicker patients had performed well, and that they intended to limit enrollment in the Phase 3 trial, PROSERA, to these sicker patients. Defendants boasted at length of the many things they had done to ensure PROSERA was run perfectly. But unbeknownst to investors, a clinic in Porto Alegre, Brazil, was showing alarming red flags. Because PAH is an ultrarare disease, Gossamer established 191 sites to recruit just 390 patients. The Porto Alegre Clinic had recruited 27 patients—an almost unheard-of concentration in a PAH trial. The site also had a materially lower screen-failure rate, and its patients appeared sick on subjective measures but healthier on objective measures. On February 23, 2026, Defendants announced that PROSERA had not met its primary endpoint, and its stock price fell, damaging investors. Over the following days, Defendants disclosed that one Brazilian clinic (the Porto Alegre

Clinic) drove the anomalous result. Over the next few months, hoping to convince investors that the FDA might disregard the Porto Alegre Clinic's results, Defendants cited numerous red flags in the subjects' baseline characteristics—***all of which were known to Defendants even as they praised the impeccable manner in which they had conducted PROSERA***. Defendants told investors that they had run PROSERA by the book, even as they were aware of a suspicious clinic with the potential to tank the trial. In the end, the risks Defendants took meant that they did not report positive PROSERA results, imperiling approval and delaying patient access to a potential treatment.

4. Gossamer is a biopharmaceutical development company. Its only activity is developing seralutinib as a treatment for pulmonary conditions. Gossamer's most advanced clinical trials were for treatment of pulmonary arterial hypertension, or PAH.

5. In December 2022, Gossamer announced results for seralutinib's Phase 2 clinical trial, TORREY. While the drug reached its primary endpoint, it did not reach its far more important secondary endpoint, the 6-minute walk distance test ("6MW Test" and "6MW Distance"), which measures whether and how much the treatment increases the distance patients can walk in 6 minutes. This secondary endpoint was the primary endpoint for Gossamer's Phase 3 clinical trial, PROSERA, which was about to begin.

6. TORREY's results suggested that seralutinib was an effective treatment for PAH and an important addition to physicians' treatment options. But suspecting that a drug is useful and proving it to the FDA's satisfaction are two different things. And here, TORREY's failure to meet PROSERA's primary endpoint alarmed investors.

7. To reassure investors that PROSERA would meet the 6-minute walk distance endpoint, Defendants presented the results of a subgroup of sicker patients.

Defendants told investors that so-called enrichment of patients would ensure that PROSERA was only tested on the sicker patients, where its effect was supposedly detectable.

8. PAH is a very rare condition. It afflicts approximately 192,000 patients worldwide. So sponsors must spread their recruitment efforts wide. For example, PROSERA recruited 390 patients in 191 sites, for an average of 2.0 patients per site. The largest recruiter in North America only enrolled 6 patients.

9. Investors did not know, because Defendants concealed the fact, that a single clinic in Porto Alegre, Brazil, recruited 27 patients. The Porto Alegre metropolitan area's population is 4.3 million. Prevalence in Brazil is estimated at 50 cases per million, implying that 12.6% of the entire area's PAH population was enrolled in the trial, an unheard-of rate.

10. Trying to do something about the Porto Alegre Clinic—such as capping or slowing enrollment—would have had a host of unpredictable consequences. It could have irritated the clinic's primary investigator. It could have raised the FDA's suspicions. It could have raised suspicions with Gossamer's partner, which was focused on the successful outcome of PROSERA. And once enrollment was complete, Defendants no longer had any good options. So Defendants did nothing, hoping that positive clinical trial results would moot the issue.

11. That decision in itself was not securities fraud. What was securities fraud was Defendants' repeated boasts that they had enrolled a patient population that was "***precisely*** what we have targeted," that their criteria were applied "incredibly stringent[ly]," demonstrating their "discipline and operational excellence," and that they had taken steps, including Defendants themselves visiting sites, to ensure that the sites carried out directions to the letter.

12. On February 23, 2026, Defendants announced that PROSERA had not

reached statistical significance on its primary endpoint, the 6MW Distance, missing the p-value by 0.007.

13. When they announced the results of PROSERA, Defendants' goal switched from convincing investors that PROSERA had been exceptionally well run to convincing investors that approval was still possible despite the overall results. Defendants offered grounds to disregard the results as anomalous.

14. On the call, Defendants blamed unusual and exceptional placebo performance in Latin America. But in the next few days, Defendants admitted that the problem was not with Latin America as a whole, but with one specific clinic in Brazil—the Porto Alegre Clinic—which they admitted had recruited 27 patients. Defendants told investors that patients on placebo in that clinic had performed exceptionally well.

15. To cast doubt on the results from the Porto Alegre Clinic, Defendants disclosed huge red flags that were visible and known far before unblinding, when they were misleadingly telling investors they had run the trial perfectly.

16. Patients could qualify for the trial through a combination of objective (e.g. blood tests) and subjective (e.g. physician-graded function assessments) metrics. The patients at the Porto Alegre Clinic had scores on subjective metrics that met enrichment criteria, but their scores on objective metrics suggested they were healthy. The clinic also had a materially lower screen failure rate than other clinics, a sign that the inclusion and exclusion criteria may not have been applied stringently. The low screen rate was particularly odd because 8 or 9 of the patients were new to the clinic, meaning that the clinic's physicians had had no experience following the patients. This should have led to a higher screen failure rate.

17. Seeking to discredit the Porto Alegre Clinic's results, Defendants themselves identified each of these findings as red flags. The presence of these red flags, identified as such, meant that Defendants' Class Period statements boasting

of the rigor with which they had run the trial and selected the appropriate population were false and misleading when made.

18. The enrollment of patients that were less sick meant that PROSERA did not have the right population for the trial. Moreover, the red flags Defendants identified suggested that the trial may have been run poorly. And a poorly run trial at a clinic that accounts for 6.9% of the total patient population can easily ruin results.

19. The Porto Alegre Clinic proved to be an extreme outlier. Removing its results from the analysis increased the treatment effect versus placebo by 28% and made the effect statistically significant.

20. When PROSERA's results were announced, Gossamer's stock price fell from $2.13 per share on February 20 to $0.42 per share on February 23, the next trading day, down $1.71 (80%).

## II. JURISDICTION AND VENUE

21. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

22. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

23. Venue is proper in this Judicial District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b). Gossamer is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions, and the subsequent damages, took place within this Judicial District.

24. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and

the facilities of the national securities markets.

## III. PARTIES

25. Lead Plaintiff Martin Meienhofer, as set forth in his prior-filed Certification (ECF 13-4), incorporated by reference herein, purchased Gossamer common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of Defendants' fraud.

26. Plaintiff Mike Fleming, as set forth in his Certification, attached hereto as Exhibit A, purchased Gossamer common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of Defendants' fraud.

27. Plaintiff Peter Zech, as set forth in his Certification, attached hereto as Exhibit B, purchased Gossamer common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of Defendants' fraud.

28. Defendant Gossamer is incorporated in Delaware and has its principal executive offices at 3115 Merryfield Row, Suite 120, San Diego, CA 92121. During the Class Period, the Company's common stock traded on the NASDAQ Stock Market (the "NASDAQ") under the symbol "GOSS."

29. Defendant Faheem Hasnain co-founded Gossamer and served as Gossamer's CEO, Chairman, and a member of its Board of Directors, at all relevant times. Before co-founding Gossamer, Defendant Hasnain gained a wealth of experience in the pharmaceutical and biotechnology industries, having previously served in executive roles and on the boards of directors at a number of companies in this sector. Earlier in his career, Mr. Hasnain held roles with Bristol Myers Squibb and GlaxoSmithKline. He worked at the latter for 14 years. From 2004 to 2008, he held a number of roles at Biogen, Inc., a biotechnology company. He then moved to PDL BioPharma, where he was President, Chief Executive Officer and a director. When PDL spun off a division, calling it Facet Biotech Corporation, he continued as its President and CEO. He held that position from December 2008

until the company's acquisition by Abbott Laboratories in April 2010. From November 2010 to August 2015, he served as President, CEO and as a Director of Receptos, Inc., a public company formed in 2009 focused on developing treatments in immunology and metabolic disorders. He currently serves as Chairman of the Board of Directors at Kura Oncology & Sente, Inc. In the past, he has served on the boards of Mirati Therapeutics, Inc., Ambit Biosciences Corporation, Tocagen Inc., Tercica, Inc., Aragon Pharmaceuticals, Somaxon Pharmaceuticals, Inc., and Vital Therapies, Inc.

30. Defendant Bryan Giraudo has served as the Chief Financial Officer of Gossamer Bio since May 2018 and Chief Operating Officer since September 2021. Defendant Giraudo has had a long career in healthcare finance. He started at Merrill Lynch and Co.'s Global Healthcare Investment Banking Group in 1997, where he remained until 2009. From 2009 to April 2018, he was a Senior Managing Director at Leerink Partners, where he was responsible for their western North America and Asia Pacific biotechnology and medical technology banking practice. As CFO of Gossamer, Defendant Giraudo has overseen all of the Company's financing and fundraising activities, from its inception to the present day.

31. Defendants Hasnain and Giraudo are the "Individual Defendants."

32. Gossamer and the Individual Defendants together are the "Defendants."

## IV. DEFENDANTS' MISCONDUCT

### A. Background

#### *1. PAH and Key Metrics*

33. Pulmonary hypertension is a condition in which pressure in the pulmonary circulation system is abnormally elevated. Pulmonary arterial hypertension, or PAH, is a form of pulmonary hypertension distinguished by increased resistance in the small pulmonary arteries before blood reaches the left

side of the heart.

34. PAH is a progressive and potentially fatal disease. PAH thickens, narrows, and sometimes obstructs the small pulmonary vessels through which the right ventricle must pump blood.

35. As the pulmonary vessels narrow, pulmonary vascular resistance, or PVR, rises. The right ventricle must generate greater pressure to move blood through the lungs. Over time, the right ventricle fails and patients experience progressive shortness of breath, fluid retention, and eventually death.

36. Clinicians commonly describe symptom severity using World Health Organization functional classes. Functional Class II patients have a "mild" limitation of physical activity; they are comfortable at rest; but "ordinary activity" can cause effects like shortness of breath or fatigue. Functional Class III patients have a "marked" limitation; they are also comfortable at rest; but "less-than-ordinary activity" produces symptoms.

37. The six-minute walk test, or 6MW Test, measures how far a patient can walk on a flat surface in six minutes. The resulting six-minute walk distance, or 6MW Distance, is an inexpensive, familiar, and repeatable measure of functional exercise capacity that has served as the primary endpoint in many PAH drug trials.

38. A trial's change-in-6MW Distance endpoint compares each patient's change from baseline and then estimates the difference between the active-treatment and placebo groups. A statistically significant positive placebo-adjusted difference supports a conclusion that the treatment improved exercise capacity over the study period.

39. The Registry to Evaluate Early and Long-Term PAH Disease Management, or REVEAL, risk calculators combine clinical measures to estimate a patient's risk of disease progression and death. REVEAL Lite 2 is an abridged, noninvasive version combining WHO functional class, six-minute walk distance,

NT-proBNP (a measure of myocardial heart stress), and a few other metrics.

40. Because REVEAL Lite 2 incorporates functional class, walking capacity, and cardiac stress, it can in theory be used not only to describe prognosis but also to select a trial population with demonstrable, active impairment. That feature later became central to Gossamer's explanation of how it intended to avoid the problem of having imbalanced placebo/active treatment arms, which was an issue in TORREY.

41. 6MW Distance can exhibit a ceiling effect. A patient who can already walk a comparatively long distance at baseline may have little measurable room to improve, even if the drug produces a biological effect. PAH trials have therefore often excluded relatively mild patients with baseline distances above approximately 450-500 meters when change in 6MW Distance is the efficacy endpoint. Conversely, patients who are too ill, clinically unstable, or limited by conditions unrelated to PAH may be unable to translate improved pulmonary physiology into additional walking distance. The best 6MW Distance population is thus neither too sick nor not sick enough; it is a population with active PAH-related impairment and enough functional reserve to improve.

42. For a 6MW Distance trial, patient selection thus affects both sides of the efficacy comparison. The active arm must contain patients with enough PAH-related impairment to register a treatment response, and the placebo arm must contain patients whose baseline disease and testing behavior do not generate an outsized apparent improvement unrelated to the drug.

43. That principle is the central link between TORREY and PROSERA. TORREY showed a statistically significant hemodynamic benefit but no statistically significant overall improvement in 6MW Distance. Gossamer's decision to make 6MW Distance the pivotal PROSERA endpoint therefore made enrollment of the intended patient population—not merely delivery of seralutinib—

the premise on which PROSERA's success depended.

*2. Defendants Claim to Learn TORREY's Lesson*

44. Seralutinib, formerly known as GB002, is an investigational small-molecule tyrosine-kinase inhibitor developed for inhaled delivery to the lungs through a dry-powder inhaler.

45. In October 2017, Gossamer entered an exclusive worldwide license agreement with Pulmokine, Inc. for intellectual-property rights covering GB002 and related backup compounds. Gossamer thereafter assumed responsibility for developing the compound that became seralutinib.

46. After running two small Phase 1 clinical trials, Gossamer initiated TORREY, a multinational Phase 2, randomized, double-blind, placebo-controlled trial in adults who were WHO Functional Class II or III and remained on stable background PAH therapy.

47. TORREY screened 151 patients and 86 were randomized at 40 sites.

48. TORREY's key entry criteria included a sufficiently high PVR and baseline 6MW Distance between 150 and 550 meters. The 550-meter maximum was significantly higher than typical clinical trials, which usually have a maximum distance between 400 and 500 meters.

49. TORREY's primary endpoint was change from baseline in PVR at Week 24. Its secondary endpoint was change from baseline in 6MW Distance at Week 24. Thus, the study separately assessed whether seralutinib improved pulmonary hemodynamics and whether it improved exercise capacity.

50. Randomization was stratified by baseline PVR, not by functional class. In a trial of only 86 patients, that design left the study vulnerable to an imbalance in the proportion of less-impaired Functional Class II and more-impaired Functional Class III patients assigned to each arm.

51. On December 6, 2022, Gossamer announced TORREY's topline

results.

52. The treatment arms were materially imbalanced by functional class. The placebo group contained 20 Functional Class II patients and 22 Functional Class III patients. The seralutinib group contained 30 Functional Class II patients and only 14 Functional Class III patients. So in the seralutinib group, approximately two thirds of the subjects were functional class II and only one third were functional class III. The imbalance risked obscuring whether the study drug is effective.

53. TORREY met its primary endpoint. At Week 24, the mean difference in PVR between seralutinib and placebo was a 14.3% placebo-corrected improvement, with a p-value of 0.0310.

54. However, TORREY did not meet its secondary endpoint of change in 6MW Distance in the overall population. The placebo-adjusted difference was only 6.5 meters, with a p-value of 0.5972.

55. The failure mattered because, except under an approval pathway not pursued by Gossamer, the FDA does not accept PVR as a sufficient primary endpoint. Thus, to achieve approval, Gossamer would later necessarily choose 6MW Distance—not PVR—as PROSERA's primary endpoint. The pivotal trial would therefore rise or fall on the functional outcome that TORREY had missed in its overall population.

56. Gossamer responded to the overall 6MW Distance failure by focusing on prespecified subgroups with more severe disease at baseline. The most prominent was the Functional Class III subgroup—the group with marked activity limitation that had been underrepresented in TORREY's seralutinib arm.

57. Among Functional Class III patients, Gossamer reported a 21% placebo-adjusted reduction in PVR, with a nominal p-value of 0.0427, and a 37.3-meter placebo-adjusted improvement in 6MW Distance, with a nominal p-value of 0.0476.

58. Gossamer also reported stronger results among patients with baseline REVEAL 2.0 scores of at least 6. In that higher-risk subgroup, PVR improved by 23%, with a nominal p-value of 0.0134, while 6MW Distance improved by 21.9 meters, with a nominal p-value of 0.2482.

59. The higher-risk subgroup's 6MW Distance result was directionally favorable but not statistically significant. Gossamer combined the results together with the Functional Class III result to claim that seralutinib's functional benefit was concentrated in patients with greater baseline disease burden.

60. Defendants later attributed the imbalance and the less-severe illness of the study population in part to the fact that TORREY was conducted during the COVID-19 pandemic (patients were recruited from November 2020 to April 2022), when the usual PAH trial population was less available. Defendants explained that less-sick patients in TORREY sometimes walked more than 450 meters and had low or normal NT-proBNP, and that the functional class imbalance amplified the problem.

61. After TORREY, Gossamer elected to pursue a single Phase 3 registrational trial called PROSERA. The company reported that FDA and EMA were aligned on a two-arm trial of approximately 175 patients per arm using seralutinib 90 mg twice daily and an enriched PAH population.

62. Gossamer selected change from baseline in 6MW Distance at Week 24 as PROSERA's primary endpoint. PROSERA thus did not repeat TORREY's successful PVR primary endpoint; it made the overall functional endpoint that TORREY had failed the decisive Phase 3 measure.

63. In a July 2023 SEC-filed presentation, Defendants described PROSERA's eligibility criteria as targeting a PAH population based on the TORREY subgroup with more severe disease or higher risk of progression, defined by baseline risk score, functional class, PVR, and exercise capacity.

64. First, Gossamer lowered the upper limit for baseline 6MW Distance from 550 meters in TORREY to 450 meters in PROSERA, keeping a lower bound of 150 meters. That change was directed at the ceiling-effect concern: a patient already walking more than 450 meters had comparatively little room to show a drug-related increase.

65. Second, the initial design required either a REVEAL Lite 2 score of at least 5 or NT-proBNP of at least 300 ng/L. Gossamer marked both the 150-to-450-meter 6MW Distance range and the REVEAL Lite 2 or NT-proBNP requirement as key enrichment criteria.

66. Third, Gossamer added functional class as a randomization stratification factor. That change was designed to prevent a recurrence of TORREY's imbalance, in which the seralutinib arm contained disproportionately more Functional Class II patients.

67. In the July 2023 investor presentation, Gossamer also identified the selection of PPD as the contract research organization as a means of reducing execution risk in enrollment and 6MW Test conduct. That representation linked patient selection and test quality as the two operational controls intended to protect the primary endpoint.

68. Accordingly, the integrity of screening, eligibility review, site selection, monitoring, and endpoint quality control were inseparable from the scientific premise of PROSERA. TORREY had already supplied evidence of PVR activity; PROSERA was testing whether Gossamer could produce a walking-distance benefit by selecting and managing the particular patients in whom that activity was expected to materialize as measurable functional improvement.

69. Defendants' statements to investors touted these changes. As Richard Aranda, Gossamer's Chief Medical Officer, told investors at the TORREY open-label extension update in December 2023, "we are enriching for a sicker population

than what was studied in TORREY."

70. At the Barclays 26th Annual Global Healthcare Conference on March 13, 2024, asked "can you maybe talk about some of the levers you guys are pulling [for Phase 3]?" Robert Roscigno, a member of Gossamer's management team, explained that "[s]o we can control the population, and it's important to study a population that has appropriate, if you will, impairment." Roscigno added that using REVEAL Lite scores "***guarantees*** us that we'll have patients with enough impairment. So those in the active arm, if seralutinib is truly having a treatment effect, which we believe it will, will express that."

71. Defendants revealed more details. For example, at the December 3, 2024, Piper Sandler conference, Defendant Giraudo stated that, above and beyond selecting for sicker patients, "the QA/QC, aside from what we're doing from a patient enrichment, has been very, very robust." Defendant Giraudo also assured investors that "we're watching the baseline characteristics of the patients that are coming into the study … I would say it's working quite well."

72. When enrollment was nearly complete, Defendants acknowledged that patient selection had been critical and claimed it had been a success. A press release announcing Q1 2025 results included a quotation from Defendant Hasnain stating that "[e]nrolling the appropriate patients for this study was of paramount importance and the baseline characteristics of those who have been randomized to date demonstrate that our diligence and focus on study quality has paid off."

73. On an earnings call that day, Hasnain added that "[w]hile nearing completion of enrollment is a significant achievement in and of itself, what really matters is enrolling the correct population to best position PROSERA for a successful outcome."

74. After describing the baseline characteristics, Hasnain added "Now, why are we spending so much time walking through these baseline characteristics?"

Hasnain answered his own question: "[S]tudy after study in PAH has shown that patients who are sicker at baseline, those with more room to improve, tend to have better outcomes."

75. And on the call, Hasnain also boasted of the "stringent" screening process: "[W]e screened somewhere in the neighborhood of 750 patients this study … the fact that that's about double what we have actually will end up enrolling, that should tell you two things. One, that we've been incredibly stringent to our entry criteria into this study…"

76. Defendants continued to boast that PROSERA had been conducted at high levels of quality assurance and quality control. On a September 3, 2025, call, Defendant Giraudo told investors: "we have 191 sites in PROSERA. A Gossamer employee has visited every single one of those sites multiple times, is working with a—on a very consistent and daily basis with site, study coordinators, with nursing staff, with KOLs, with investigators, having a constant in-person daily dialog."

77. Defendants made statements that described in detail how Gossamer had ensured that the minutest detail was controlled. As set out below, Defendants claimed that Gossamer took pictures of the shoes the patients wore at the baseline 6MW Distance to ensure that, at week 24, they would wear the same shoes. Defendants also supposedly kept track of what the patients were wearing to ensure that at 24 weeks they would wear similar clothing.

*3. Enrollment Procedure*

78. Patients seeking enrollment had to pass multiple hurdles to be included in the clinical trial. First, doctors preliminarily reviewed patient charts to determine whether their patients appeared to qualify. Second, actual eligibility was determined through formal screening. Doctors ran tests on the patients to determine whether they met the inclusion and exclusion criteria. According to a PROSERA patient guide, the doctors examined patients, collected medical history, ran blood and urine

tests, echocardiography/electrocardiography, pulmonary-function testing, right heart catheterization when required, and at least 2 6MW Distance tests conducted at different times. Screening took up to 4 weeks. Gossamer and the firm it retained to conduct the clinical trials monitored the tests, had access to results, and independently screened the patients based on the information submitted.[1]

79. That screening process resulted in numerous patients being thrown out. Indeed, on the Q1 2025 earnings call, Defendant Hasnain described the application of the criteria as "incredibly stringent."

*4. PAH Rarity and Clinical Trials*

80. PAH is an extremely rare disease. A 2025 Lancet article by 293 authors with 266 listed institutional affiliations, using cutting-edge research techniques, estimated just how rare: only 192,000 persons worldwide suffer from PAH.[2] Similarly, a panel of experts who created clinical practice guidelines for the treatment of PAH in the European Union estimated prevalence at 48-55 cases per million adults.[3]

81. Not every patient is eligible for trial participation. Customary

---

[1] Gossamer Bio, Inc., What to Expect at Each Visit: The PROSERA Study, Protocol GB002-3101 (U.S. participant guide, July 2024), https://proserastudy.com/wp-content/uploads/2024/07/What-to-expect-at-each-visit-English-USA.pdf (last accessed Aug. 10, 2026).

[2] Peter J. Leary et al., *Global, Regional, and National Burden of Pulmonary Arterial Hypertension, 1990–2021: A Systematic Analysis for the Global Burden of Disease Study 2021*, 13 Lancet Respiratory Medicine 69, 69–79 (2025), https://doi.org/10.1016/S2213-2600(24)00295-9

[3] Marc Humbert et al., 2022 ESC/ERS Guidelines for the diagnosis and treatment of pulmonary hypertension: Developed by the task force for the diagnosis and treatment of pulmonary hypertension of the European Society of Cardiology (ESC) and the European Respiratory Society (ERS). Endorsed by the International Society for Heart and Lung Transplantation (ISHLT) and the European Reference Network on rare respiratory diseases (ERN-LUNG), European Heart Journal Volume 43, Issue 38, 3618-731, available at https://academic.oup.com/eurheartj/article/43/38/3618/6673929

conditions for trials (versions of all of which were in PROSERA) include:

(a) Patients who are too sick or not sick enough are commonly excluded. For example:

i. Patients who are not WHO Functional Class II or III are usually excluded;

ii. Trials typically specify a 6MW Distance of around 100-150 meters to around 450-550 meters, excluding still more patients;

iii. Trials typically impose additional requirements with respect to PVR, systolic blood pressure, and BMI. PROSERA additionally required stable background therapy, precluding patients who had just started a treatment regimen.

(b) Trials typically exclude patients who have various types of PAH. For example, PROSERA excluded patients with PAH related to various conditions, like HIV, schistosomiasis, portal hypertension, or pulmonary veno-occlusive disease. PROSERA also limited inclusion to patients who had a simple repaired shunt.

(c) Trials typically specify whether patients should, or should not, be on other medications.

(d) Trials typically exclude current smokers; patients with current alcohol or drug abuse disorder, or with certain comorbidities; women who are pregnant, nursing, or intend pregnancy (two-thirds of PAH patients are women); or patients outside of a particular age range.

82. These eligibility criteria narrow the eligible population to just a fraction of the total population. For example, a 2009 clinical trial with looser enrollment criteria than PROSERA screened 712 patients and only 65 (9%) were

randomized.[4]

83. Moreover, not every eligible patient will want to participate. For example, in PROSERA, in addition to screenings, patients must appear for 13 appointments. But patients eligible for the trial are in poor health and by definition have limited mobility. Further, the patient's blood will be drawn at each of the 13 appointments, which can be a limiting factor for some patients. Patients may have to travel long distances to get to the clinic. The patient must also be dosed twice daily for 48 weeks. Thus, some patients who might qualify would not be interested in participating.

84. The rarity of PAH patients who are able and willing to participate in clinical trials makes recruitment difficult. PAH trials have been characterized by small numbers of participants and huge numbers of sites. The most recent large trial, STELLAR, recruited 323 patients from 91 sites, or approximately 3.55 patients per site. An earlier trial, SERAPHIN, recruited 742 patients from 151 sites, or approximately 4.91 patients per site.

85. The anticipated difficulty in recruiting patients influenced PROSERA's design. PROSERA set a goal of recruiting 350 patients. To meet this goal, Gossamer planned to use approximately 160 sites, with the assumption that each site would only yield two patients.

86. Sites did not tend to greatly exceed the average number of patients. For example, the largest North American site, by far, was the University of Rochester, led by Dr. R.J. White. In his institutional profile, Dr. White states that the University of Rochester is a PAH Comprehensive Care Center and that it treats approximately 300 patients with PAH. Dr. White also reports that Rochester was a lead enroller,

---

[4] Steven M. Kawut et al., A Randomized Clinical Trial of Aspirin and Simvastatin for Pulmonary Arterial Hypertension: ASA-STAT, 123(25) Circulation 2985, 2988 (2011), https://doi.org/10.1161/CIRCULATIONAHA.110.015693.

or the lead enroller, for multiple PAH clinical trials.

87. The University of Rochester and Dr. White recruited just 6 patients for PROSERA.

*5. Gossamer Goes All in on One Site in Brazil*

88. Gossamer recruited 27 patients from a single site in Brazil. That site accounted for 24.8% of Latin American recruitment and 6.9% of the total PROSERA population.

89. That site was the Irmandade da Santa Casa de Misericórdia de Porto Alegre ("Porto Alegre Clinic"). The evidence for the identification includes:

(a) Defendants stated that the site from which they recruited 27 patients was one of the largest recruiters in Latin America in the STELLAR trial.

i. The Porto Alegre Clinic was one of only three sites in Brazil that participated in both STELLAR and PROSERA.

ii. The Porto Alegre Clinic's principal investigator, Dr. Gisela Meyer, was a named STELLAR author and a PROSERA poster author, suggesting that the Porto Alegre Clinic contributed a significant number of patients to both STELLAR and PROSERA.

90. Porto Alegre is a relatively small regional metropolitan center. Its population is 1.4 million, while the Porto Alegre metropolitan area's population is 4.2 million.

91. The Brazil Thoracic Society estimates PAH prevalence of 40-55 persons per million. Thus, the population of PAH patients in Porto Alegre's

metropolitan area should only be around 168-231.[5]

92. It is infeasible for patients outside the Porto Alegre metropolitan area to participate in PROSERA. Porto Alegre is the capital of the state of Rio Grande do Sul, Brazil's southernmost state, far from the country's economic core, and difficult to access by plane.

93. PROSERA required up to 15 visits, so patients located outside the Porto Alegre metropolitan area would have to repeatedly find ways to travel long distances and obtain lodging.

94. Rio Grande do Sul state has no regular intercity passenger-rail network, and its roads are in poor condition. Patients located outside the Porto Alegre area would find it difficult to travel to the Porto Alegre Clinic and would likely have to fly to the area and find lodgings for at least one night.

95. Compounding the problem, in April-May 2024, the state of Rio Grande do Sul was hit by Brazil's worst floods in 80 years, drastically limiting transportation. Entire cities were made temporarily inaccessible. Porto Alegre's airport did not resume service until October.

96. Patients with PAH face significant mobility limitations. Given the above transport limitations, Defendants would know that the Porto Alegre Clinic's reach did not expand beyond the metropolitan area.

97. According to a June 25, 2026, H.C. Wainwright analyst report, management deliberately selected the Brazil site because they thought that site would show anomalously good results:

> While Merck did not break down sotatercept's 6MWD performance by clinical site, that same South America site enrolled a large proportion

---

[5] José Leonidas Alves Jr. et al., Diagnosis of Pulmonary Arterial Hypertension: A Statement from the Brazilian Thoracic Association, 51(6) J. Bras. Pneumol. e20250065, Introduction (2025), https://doi.org/10.36416/1806-3756/e20250065.

of the patients in sotatercept's STELLAR trial and sotatercept outperformed in South America compared to other geographies; thus, by enrolling so many patients in that single site in PROSERA, Gossamer's original reasoning was to replicate the success observed in the STELLAR trial.

98. Even compared to sotatercept, Gossamer's recruitment from the one Brazil site was extreme.

99. STELLAR recruited 26 patients in Brazil, or 1 fewer than PROSERA recruited at just the Porto Alegre Clinic.[6] STELLAR's Brazil patients were drawn from 3 sites. One of the other sites, Instituto do Coração–HC-FMUSP in São Paulo, likely accounted for a significant number of patients. It is a well-recognized cardiopulmonary center and its principal investigator, Dr. Souza, was a STELLAR steering committee member and a primary author. Thus, even if the Brazil Site contributed a significant number of patients to STELLAR, it was nowhere near the dominant number it contributed to PROSERA.

100. Moreover, depletion from STELLAR would mean even fewer patients were available in Porto Alegre. STELLAR and PROSERA had similar inclusion and exclusion criteria, and the number of patients who would have met these criteria was quite small.

101. Patients treated in STELLAR would not be available for PROSERA. STELLAR recruitment was completed in December 2022. After STELLAR, as is customary, Merck continued to offer treatment to the trial subjects. All placebo patients were also given the opportunity to take the drug. 91.6% of STELLAR patients continued on the treatment.

102. Thus, Gossamer enrolled 6.9% of PROSERA's subjects from a center:

---

[6] EU Clinical Trials Register page for STELLAR, available at https://www.clinicaltrialsregister.eu/ctr-search/trial/2020-004142-11/results

(1) that had recently seen substantial depletion from the STELLAR trial; (2) that was selected because management believed its results in STELLAR had been abnormal.

103. After the Class Period, Defendants showed that they had been aware of numerous other red flags.

*6. Low Failure Rates*

104. On the call to announce PROSERA topline results, Defendants identified Latin America as a principal source of the placebo response that caused the study to miss its prespecified statistical threshold.

105. Defendant Giraudo explained that in PROSERA, the Latin American placebo and seralutinib groups improved by nearly the same amount.

106. Giraudo stated that "something happened in Latin America" and that Gossamer would investigate by engaging with investigators, sites, and PPD. He later referred to "issues ... with study conduct" in Latin America that Gossamer needed to understand before beginning another Phase 3 trial. Hasnain stated that the region contained numerous placebo super-responders, including patients whose six-minute walk distance improved by more than 100 meters.

107. In a February 24, 2026, report, a Wedbush analyst claimed that Defendants had disclosed a red flag:

> We spoke with management who plans to audit these sites as recruitment trends raise questions about the burden of disease in these patients. ***For example, screen failure rates appear meaningfully lower vs other regions.***

108. On February 26, 2026, Defendants delivered a public presentation to investors. According to a March 6, 2026, report by H.C. Wainwright, Defendants tracked the problems back to a single site, the Porto Alegre Clinic:

> At a healthcare conference on February 26, management publicly

disclosed that removing one Latin American site—their largest enrolling site—shifts the PROSERA p-value from 0.032 to 0.009, with the treatment effect increasing to ~17 meters.

109. Thus, the lower screen failure rate, like the other red flags, was not a problem for Latin America in general. Instead, it was a problem for the Porto Alegre Clinic. Further supporting the inference, the Porto Alegre Clinic made up almost a quarter of all Latin American enrollments.

110. A lower screen-failure rate meant that a larger proportion of formally screened candidates cleared PROSERA's multiple, cumulative entry gates. Because PROSERA had been designed to enroll patients with sufficient impairment and disease activity to show a Week 24 6MW Distance effect, a meaningfully higher screening passage rate raises questions about whether the region's screened patients have the intended burden of disease and whether initial risk and borderline eligibility criteria have been assessed comparably.

111. The red flag—lower screen failure rates—was known to Gossamer contemporaneously. Gossamer's clinical operations team generated weekly spreadsheets reporting on, among other things, site-by-site activity. These spreadsheets included the number of patients that had been screened at any given site along with the number that had passed the screening and therefore been randomized. The spreadsheets were shared with Gossamer's senior management.

112. Moreover, Defendants themselves specifically touted a high screen failure rate as proof that Gossamer had been "incredibly stringent" in applying inclusion and exclusion criteria.

*7. Healthy patients red flag*

113. In a March 11, 2026, report on a Gossamer presentation, a Leerink Partners analyst noted that management had stated that at the Porto Alegre Clinic, placebo patients' NT-proBNP median levels were 206 ng/L. Management cited this

as an example of an "irregularity" which justified an audit of that site, and raised concerns about the site's REVEAL Lite scoring.

114. Defendants only disclosed the placebo patient group's NT-proBNP metrics, which could only be known after unblinding. But the site's overall NT-proBNP metrics are part of the baseline data provided to management before unblinding. There is no reason to think that the scores of patients who received the placebo would differ from those of patients who received the treatment. Thus, the Porto Alegre Clinic's overall NT-proBNP median level was likely in the neighborhood of 206. And whatever the exact number, it would be known to Gossamer before unblinding.

115. That median NT-proBNP level shows that patients' subjective health metrics conflicted with their objective metrics.

116. The three most important noninvasive metrics for PAH prognosis are NT-proBNP levels, WHO Functional Class, and 6MW Distance. Of these, NT-proBNP levels are the only truly objective metric.

117. NT-proBNP correlates with myocardial stress. Any value below 300 ng/L is considered low risk, and the median patient score at the Porto Alegre Clinic was around 31% lower.

118. In May 2025, Defendants reported that the mean NT-proBNP level for the 324 patients recruited by then was 986 ng/L. Only very sick patients reach this level, which Defendants pointed out when they disclosed the figure. Indeed, even in TORREY, mean NT-proBNP results were 628 ng/L, or three times as high as the Porto Alegre Clinic's rough number.

119. Thus, the Porto Alegre Clinic was an extreme outlier on the most meaningful objective metric.

120. To qualify for inclusion in the trial, patients had to meet three baseline objective criteria.

121. The objective eligibility criteria were mPAP, PVR, and pulmonary capillary wedge pressure. Those thresholds were not stringent measures of disease severity. They principally confirmed that a patient had the type of pulmonary hypertension the study was intended to enroll; they did not establish that the patient was especially sick.

(a) One metric was mPAP. The required level was only the threshold used to diagnose pulmonary hypertension. Meeting it showed that pressure in the lungs was abnormally high; it did not show that the patient's disease was severe.

(b) The PVR threshold was 5. That was above the diagnostic threshold of 2, but still well below the average PVR of 7.7 in TORREY. A patient could therefore satisfy PROSERA's PVR requirement while having substantially less resistance than the average TORREY patient.

(c) The pulmonary capillary wedge pressure requirement likewise used the standard cutoff intended to screen out pulmonary hypertension caused primarily by left-heart disease. It excluded patients clearly over that line, but did not require a particularly low value or eliminate patients close to the boundary. Meeting it therefore did not show that a patient's PAH was severe.

122. The bare inclusion criteria were not designed to select only sick patients. That's why Defendants also required that patients meet one of three enrichment criteria. These are: an NT-proBNP score above 300 ng/L, PVR of at least 8 Wood units, or a REVEAL Lite score of 5 or more.

123. PVR measures the load imposed by pulmonary circulation; NT-proBNP values measure the myocardium's reaction to that score. Thus, PVR and NT-proBNP scores are closely related. Studies have generally found a very strong

correlation between the two. In statistics, "r" is a measure of how closely two things move together. It ranges from -1 to +1. An r of +1 means the two measures move perfectly together: as one goes up, the other always goes up in a perfectly consistent way. Studies have estimated the correlation between PVR and NT-proBNP metrics to be as high as r=0.81.[7] Thus, patients at the Porto Alegre Clinic almost certainly had low PVR scores as well.

124. REVEAL Lite scores are generated by aggregating multiple signs of disease. The points are set out below:




[7] Rogerio Souza et al., *NT-proBNP as a Tool to Stratify Disease Severity in Pulmonary Arterial Hypertension*, 101(1) Respir. Med. 69, 69 (2007) (reporting r=0.80 between NT-proBNP and pulmonary vascular resistance), https://doi.org/10.1016/j.rmed.2006.04.014; Mark H. Williams et al., *Role of N-Terminal Brain Natriuretic Peptide (N-TproBNP) in Scleroderma-Associated Pulmonary Arterial Hypertension*, 27(12) Eur. Heart J. 1485, 1485 (2006) (reporting r=0.81), https://doi.org/10.1093/eurheartj/ehi891.

125. A patient with objective signs of good health can still reach a REVEAL score of 5 through subjective health metrics. The score starts with a constant of 6. Even if the patient has normal systolic blood pressure (+0), heart rate (+0), renal condition (+0), and NT-proBNP (-2), the patient will still have a score of 5 or above if the patient's 6MW Distance is less than 320 meters and WHO Functional Class is III. These metrics are subjective and easy to game if patients or their physicians want to participate in the trial.

126. The markers of Functional Class II and Functional Class III are similar. They are both characterized by some limitation of physical activity and the same symptoms. The only differences are subjective and minor:

| | Functional Class II | Functional Class III |
|---|---|---|
| Degree of limitation | Slight limitation of physical activity | Marked limitation of physical activity |
| Activity threshold | Ordinary activity produces undue symptoms | Less-than-ordinary activity produces undue symptoms |

127. Whether a patient has "slight" or "marked" limitation is in the eye of the beholder; whether ordinary activities are necessary to produce symptoms, or whether less-than-ordinary activities suffice, depends on the physician's understanding of what "ordinary" and "less-than-ordinary" activities are.

128. Indeed, a study published in a 2009 article asked physicians and nurses to classify 10 patient histories into WHO Functional Class I, II, III, or IV. For most patients, fewer than half of physicians and nurses placed them in the same class.[8]

[8] Taichman D, McGoon M, Harhay M., et al., *Wide Variation in Clinicians' Assessment of New York Heart Association/World Health Organization Functional Class in Patients With Pulmonary Arterial Hypertension*, Mayo Clinic Proceedings, 84, 586-592 (2009).

129. While 6MWD is clinically intuitive, it is not a direct measure of pulmonary vascular remodeling. It is affected by motivation, encouragement, familiarity with the test, oxygen use, musculoskeletal limitations, comorbidities, corridor layout, and test administration. Standardized conduct and quality control are therefore important. For example, an article found that encouragement increased 6MW Distance by 30.3 meters.[9]

130. Moreover, patients can put more or less effort into walking. And patients who want to meet inclusion criteria on a 6MWD test can ensure that they walk less than the inclusion cutoff.

131. Thus, patients at the Porto Alegre Clinic saw a dramatic difference between objective measures of risk—PVR and NT-proBNP—and subjective, easily gameable measures, like 6MW Distance and Functional Class.

*8. New patient red flag*

132. In the June 25, 2026, HC Wainwright report, the analyst reported that management had stated:

> ***30% of [patients] were new to that site at enrollment, meaning investigators lacked a longitudinal understanding of those patients' disease course***—unlike many U.S. and European PAH centers where patients typically enter PAH trials after a longer relationship with the site and after trying available treatment modalities.

133. That Defendants identified the new-to-the-site enrollment means both that Defendants found the 30% metric high and that Defendants considered it a red flag.

134. That the patients did not have an established treatment relationship with the site makes confirming patient history more difficult.

[9] G.H. Guyatt, S.O. Pugsley, M.J. Sullivan et al., *Effect of Encouragement on Walking Test Performance*, 39 Thorax 818, 818–22 (1984).

135. As alleged above, 6MW Distance tests are substantially subject to effort. A physician who has followed a patient over time may know the patient's usual six-minute-walk range, ordinary effort and pacing, functional-class boundary, treatment adherence, oxygen practice, recent deconditioning, response to prior therapy, hospitalizations, comorbid limitations, and whether the screening visit was unusually good or bad. For a new referral, the site must infer those matters from records, interviews, and a comparatively short screening window.

136. Without a long-term relationship with the patient, the site loses an important independent longitudinal check on the baseline. This dynamic should have led to higher screen failure rates.

137. Moreover, quality of care in a specialist center is likely to be higher than in other non-specialized clinics. Thus, a patient newly entering a specialized PAH center may receive more structured medication review, adherence counseling, inhaler or oxygen instruction, transportation assistance, regular appointments, education, and encouragement to remain active.

*9. FDA guidance instructs sponsors to monitor for such red flags*

138. The FDA explicitly recognizes these issues in its guidance for trial sponsors on risk-based monitoring, and Defendants were therefore well aware of the risks that they represented.

139. FDA guidance states, *inter alia*, that centralized monitoring may be used to "analyze site characteristics, ***performance metrics*** (e.g., high screen failure or withdrawal rates, high frequency of eligibility violations, delays in reporting data), and ***clinical data*** to identify trial sites with characteristics correlated with poor performance or noncompliance."[10]

[10] *See* U.S. Food & Drug Admin., *Guidance for Industry: Oversight of Clinical Investigations—A Risk-Based Approach to Monitoring* (Aug. 2013). https://www.fda.gov/media/116754/download.

140. The guidance further states that sponsors should target their on-site monitoring to sites that display a higher risk level "(e.g., ***sites with data anomalies*** or a higher frequency of errors, protocol violations, or dropouts relative to other sites)."

141. The guidance also specifically warns sponsors like Gossamer to be wary of multiple concerns applicable to the Porto Alegre Clinic. For example, the guidance warns that sites with poor healthcare infrastructure—like Porto Alegre—"may require more intensive monitoring and consideration of on-site monitoring visits."

142. The guidance likewise warns that "endpoints that are more interpretative or subjective"—such as the 6MWD test—"may require on-site visits to assess the totality of subject records and to review application of protocol definitions with the CI."

143. Against this regulatory background, the Porto Alegre Clinic's combination of concentrated enrollment, materially lower screen failure, new-to-clinic recruitment, and discordant site-level results constituted a set of recognizable monitoring signals that warranted focused investigation.

*10. The Porto Alegre Clinic Had the Potential To Throw Off the Entire PROSERA Trial*

144. The warning signs at the Porto Alegre Clinic raised the possibility that the Clinic was not applying PROSERA's screening, baseline, treatment-period, and endpoint procedures in the same manner as the other sites.

145. Defendants' own post-readout description confirms that the concern was broader than whether the patients were sufficiently sick. Defendants referred to issues with study conduct and reported that irregularities had been identified. Defendants further said that they had initiated an audit, and undertook what they described as a forensic review of the Site's source documentation.

146. PROSERA eligibility depended on a broad collection of data points, including PAH subtype and etiology, hemodynamic measurements, laboratory values, clinician-assigned functional class, REVEAL Lite calculations, and repeated six-minute walk testing.

147. A meaningfully lower screen failure rate raised unsavory possibilities—that borderline candidates were being cleared more readily, that exclusions were being applied less stringently, or that information inconsistent with eligibility was not being identified or verified.

148. Because six-minute walk distance was both an eligibility measure and PROSERA's primary efficacy endpoint, the same site that helped determine whether a patient qualified also generated the baseline and Week 24 measurements used to decide whether the trial succeeded.

149. If a patient walked below ordinary capacity at baseline—whether consciously or unconsciously—the patient could walk farther at Week 24 without receiving any benefit from seralutinib. That mechanical rebound would appear in both treatment arms and would inflate the placebo response.

150. A patient could satisfy PROSERA's entry pathway through subjective or effort-dependent components even while an objective cardiac-stress biomarker suggested low risk. The site-level discordance between objective and subjective health metrics therefore was a red flag that demanded investigation of each of the relevant data inputs, including the functional-class assignments, six-minute-walk results, medical history, and source support for each participant.

151. The Porto Alegre Clinic's concentration made the broader conduct risk quantitatively material. Defendants disclosed that removing the Clinic increased the estimated treatment effect from 13.3 meters to approximately 17 meters, up 3.7 meters (28%). Removing the site changed the p-value from 0.032 to 0.009, below PROSERA's prespecified 0.025 threshold.

152. Defendants also reported that the Porto Alegre Clinic's placebo participants improved by approximately twice as much as its seralutinib participants, and that placebo performance at the Site was anomalous relative to other sites. The February 23 call separately identified placebo super-responders in Latin America whose walking distance improved by more than 100 meters.

*11. 27 Patients From One Clinic Was Suspicious Because It Is Well Known That Patients and Clinics Have Incentives to Participate In Clinical Trials*

153. PAH is a devastating disease. Its key symptoms include shortness of breath, fatigue, dizziness, and chest pain. As it progresses, those who suffer from PAH usually find physical exertion to be increasingly difficult, which is why the 6MW Distance test is considered a key indicator of progression—many sufferers find it laborious to walk at all. PAH makes it difficult to hold down a job.

154. Brazil's own national PAH protocol recognizes the intensity of that care. It directs that patients be risk-stratified every three to six months and evaluated periodically, also every three to six months, by a specialized service or referral-center team that may include pulmonologists, cardiologists, and rheumatologists.[11]

155. During PROSERA's enrollment period, most Brazilians lacked private medical-plan coverage. As of December 2023, only 23.9% of Brazil's population was covered by a private medical plan.[12] The remaining approximately 76.1% generally depended on Brazil's public Unified Health System, known as SUS, or

---

[11] Brazil, Ministério da Saúde, Portaria Conjunta No. 10, de 18 de julho de 2023, Anexo, Protocolo Clínico e Diretrizes Terapêuticas da Hipertensão Pulmonar, at 10, 20, available for download at https://www.gov.br/conitec/pt-br/midias/protocolos/portariaconjuntano10pcdthipertensaopulmonar.pdf/@@display-file/file

[12] Agência Nacional de Saúde Suplementar (ANS), Dados Gerais (current page; historical series updated through June 2026), unpaginated, December 2023 rows. https://www.gov.br/ans/pt-br/acesso-a-informacao/perfil-do-setor/dados-gerais

paid out of pocket for medical care.

156. Real-world evidence confirms that important PAH testing and follow-up were not uniformly delivered in Brazil. A 2024 study of PAH care in four Latin American countries reported that only 64% of the Brazilian patients studied had undergone right-heart catheterization and only 16% had undergone a simplified risk assessment during the preceding 12 months.[13]

157. The same study found that only 30% of the Brazilian patients received PAH-specific combination therapy, compared with 70% in Colombia and 79% in Argentina.[14] Only 18% of the participating Brazilian physicians were affiliated with a PAH specialist center. The authors concluded that use of risk assessment and PAH-specific combination therapy was low in Brazil and that barriers to optimal treatment warranted further investigation.

158. Sponsors want to ensure that a lack of medical resources does not affect trial results, so patients in clinical trials receive gold standard access to the healthcare system. They do not have to wait for a doctor's availability to get an appointment. The medicine is provided to them at no cost. They receive free transportation to the hospital.

159. Even if patients were placed in the placebo group, they still received excellent health care, including study-related testing, monitoring, device training, visit schedule, and travel support. They could also continue their stable background therapy.

160. Moreover, because sponsors want long-term efficacy and safety data, after the trial is over, patients can usually enroll in an open label extension. The

[13] Mauricio Orozco-Levi et al., "Pathway to care, treatment and disease burden of pulmonary arterial hypertension: a real-world survey of physicians and patients in Latin America," BMJ Open 14:e087263 (2024), at 1, 3-4 available at https://bmjopen.bmj.com/content/14/12/e087263

[14] Id. at 1, 3, 5, 7-8

sponsor will continue to provide the drug free of charge and the patient will continue to receive gold standard healthcare, potentially indefinitely.

161. It is well known in the clinical trials field that patients may massage facts to be allowed into a trial. For example, a 2,275-person study offered participants $5, $10, or $20 to complete a 1-minute online survey on vaccine attitudes. Participants who were told that only those who had had a recent influenza vaccination could participate were 10.5%-22.8% more likely to report such a vaccination than those who were told anyone could participate.[15]

162. Access to healthcare is a common motivation. For example, a study of a treatment for contraception found that 27% of enrolled patients had falsely claimed not to have used contraception in the previous 30 days. Confronted, all participants cited the need to obtain medical treatment as a reason.[16] Likewise, patients whose other option is crowded and underfunded hospitals may enroll in trials to receive better ancillary care.[17]

163. Enrollment in the trial confers a variety of benefits on not just the patient, but the enrolling practitioner as well.

164. For the physician, enrollment provides two benefits: 1) generating income for the clinic; and 2) helping under-resourced patients obtain excellent health care in systems that are often underfunded.

165. The financial angle is simple. Sponsors pay research centers for their

---

[15] Holly Fernandez Lynch et al., Association Between Financial Incentives and Participant Deception About Study Eligibility, 2(1) JAMA Network Open e187355, Results & tbl. 2 (2019), https://doi.org/10.1001/jamanetworkopen.2018.7355.

[16] Sharon L. Achilles et al., Misreporting of Contraceptive Hormone Use in Clinical Research Participants, 97(4) Contraception 346, 346-47 (2018), https://doi.org/10.1016/j.contraception.2017.09.013.

[17] Joseph Mfutso-Bengo et al., Why Do Individuals Agree to Enrol in Clinical Trials? A Qualitative Study of Health Research Participation in Blantyre, Malawi, 20(2) Malawi Med. J. 37, 39-40 (2008), https://doi.org/10.4314/mmj.v20i2.10898.

patients. In a 2018 paper, a researcher reviewed 63 contracts for industry-funded, international multicenter trials conducted at a Brazilian public university from 2010 through 2016. In every instance, the university received per-patient payments for each patient participating in the study.[18]

166. Payments, particularly with very rare diseases like PAH, are substantial. In this case, payments may have been on the order of $25,000 to $60,000 per study participant who enrolled in the study. For the Porto Alegre Clinic, this would have generated revenues of $675,000 to $1,620,000.

167. This income can be a major boon to the clinics and hospital systems that employ these physicians. As such, there is a powerful enrollment incentive.

168. The Porto Alegre Clinic is part of a philanthropic hospital system, the Santa Casa / Pavilhão Pereira Filho hospital system, that experiences recurring deficits.

169. Brazilian hospitals are funded through a combination of subsidies, transfers, debt, donations, and research revenue, including from clinical trials.

170. Under Brazilian law, philanthropic hospitals like Santa Casa must devote at least 60% of their services to charitable cases.

171. They are reimbursed by the government. But the reimbursement rate on charitable cases is widely acknowledged to be insufficient to cover costs. For example, the Santa Casa hospital system acknowledged a R$150 million ($30 million) recurring deficit from providing charitable care on total annual revenues of R$2.14 billion ($418 million). Charitable services represented 70% of encounters but only 27.1% of gross service revenues.

172. Indeed, in January 2024, Brazil enacted Law 14,820, requiring annual

[18]Rodrigo Batagello, Recrutamento de sujeitos em ensaios clínicos multicêntricos internacionais financiados pela indústria [Recruitment of Subjects in Industry-Sponsored Multicenter International Clinical Trials], 27(4) Saúde e Sociedade 1033, 1033-43 (2018), https://doi.org/10.1590/S0104-12902018180292.

review of amounts paid to the network. Acknowledging the shortfalls, the Ministry then made additional payments.

173. As a result, charitable hospitals face structural and recurrent funding pressure. They must seek other sources of revenue to make up for the deficit from provision of public services. Clinical trials are a significant source of revenue and can be material to individual subunits like the Porto Alegre Clinic.

174. That said, many physicians who bend enrollment criteria aren't motivated by pecuniary concerns at all.

175. Physicians often find themselves torn between different obligations—to their patients, to their employers, to insurance or governmental payors, and to their own sense of ethics. Where those obligations come into conflict, physicians can be forced to make hard decisions.

176. Here, physicians treating PAH sufferers had an incentive to help their patients in so many ways: with access to a new drug, with a significant increase in attention and care from the clinic, and with transportation and meals for individuals who may lack both.

177. Thus, it is well understood that patients are very eager to access clinical trials, particularly if they do not otherwise have full access to medical resources, and that doctors are very eager to place their patients into clinical trials. The fact that one site was able to recruit 12.6% of the estimated total PAH population in its catchment area into one clinical trial despite strict enrollment standards was a red flag that, perhaps, patients were recruited who did not qualify or the trial was being run improperly, even before the numerous other red flags Defendants themselves identified. Defendants' unqualified statements that they had perfectly conducted the trial and recruited the perfect population, in spite of these glaring red flags, were actionable.

**B. Loss Causation**

178. On February 23, 2026, Gossamer published a press release and hosted a Special Call announcing the topline results from PROSERA. The trial was not a success: PROSERA missed its primary endpoint, which was an increase in 6MW Distance. The statistical significance cutoff was 0.025.

179. Defendants claimed that unusually good placebo performance in Latin American patients was to blame. Defendants presented the following slide:




180. On the call, Defendants revealed that the trial would have been successful if they excluded Latin America:

> Yes. So I think, Andreas, you recall that we made a significant investment in Latin America following the very, very significant results that we saw in the STELLAR study for sotatercept, where that was a geography that patients benefited the most. So certainly, for us to see an almost parity between the placebo rate and the treatment rate and how the statistical plan using Hodges-Lehmann works where that ended up reducing the treatment effect by 8 meters.
>
> So adding 8 meters on the placebo side was extremely, extremely

> disturbing to our team because, again, we expected to have an effect that has been seen in most PAH studies where Latin America is the best performing geography. We're still early in the investigation of what happened in Latin America, and we certainly will have more to come as we continue that work.

181. This admission caused the price of Gossamer's common stock to crater from a closing market price of $2.13 per share on February 20 to $0.42 per share on February 23 (the next trading day), a decline of $1.71 (80%).

182. And while Defendants indiscriminately blamed all of Latin America on the call, later, on February 26, they revealed that the problem was concentrated in the Porto Alegre Clinic. If they excluded the Porto Alegre Clinic, the treatment effect increased to 17 meters and the p-value fell from 0.032 to 0.009.

183. As the report noted, Gossamer also stated that this site was "anomalous relative to other sites globally, with placebo outperforming the active arm at Week 24—a result that is physiologically inconsistent with the natural history of progressive PAH."

184. Defendants continued to disclose red flags that were available before the data readout. For example, in a March 11, 2026, report on a Gossamer presentation, a Leerink Partners analyst noted that:

> Mgmt. highlighted the inflated placebo response in Latin America, with one site in particular in Brazil where irregularities have been identified and an audit is underway. For example at that site, placebo patients had NT-proBNP median levels of 206 and <300 is typically considered low risk when looking at NT-proBNP, raising questions around REVEAL-lite scoring application.

### C. Defendants' Materially False and Misleading Statements and Omissions

185. Beginning on May 15, 2025, Defendants made material misrepresentations and omissions about PROSERA, claiming that their enrichment strategy had produced the desired study population. However, the information available to them at the time showed that it had not.

186. On May 15, 2025, Gossamer issued a press release announcing its first-quarter 2025 results. Quoting Defendant Hasnain, the release stated:

> ***Enrolling the appropriate patients for this study was of paramount importance, and the baseline characteristics of those who have been randomized to date demonstrate that our diligence and focus on study quality has paid off.***

187. Hasnain's statement was materially false and misleading when made. By stating that the baseline data demonstrated that Gossamer's diligence and focus on study quality had "paid off," Hasnain conveyed that Gossamer's patient-selection and quality controls were working throughout PROSERA. In fact, the Porto Alegre Clinic supplied 27 patients—enough to affect the trial-wide result—while its extraordinary recruitment, lower screen-failure rate, low objective biomarker values, discordance between subjective and objective metrics, and large proportion of new-to-site patients raised substantial doubt that the Clinic had selected and measured patients consistently with the rest of the trial. Those undisclosed facts made the aggregate baseline characteristics unreliable evidence that Gossamer's study-quality efforts had succeeded.

188. On May 15, 2025, after market close, Gossamer held its Q1 2025 earnings call. In his opening remarks, Defendant Hasnain stated that:

> We aim to enroll a population where a greater magnitude of effect could be seen on the six-minute walk distance at 24 weeks, which is the

> primary endpoint, thereby increasing the likelihood of success of PROSERA. ***I am happy to say that given the baseline characteristics that we've seen thus far, the eligibility criteria was successful in enrolling the exact intended patient population.***

189. The emphasized portion of Hasnain's statement was materially misleading because the baseline characteristics from the Porto Alegre Clinic that Defendants had seen so far raised red flags that the Clinic, the largest recruiter in the trial, had not rigorously recruited the appropriate population. The red flags included: (a) the sheer number of patients recruited, especially compared to the Porto Alegre metropolitan area and well-documented difficulties for patients residing outside of that area to attend the clinic; (b) discordance between objective health metrics and subjective and gameable metrics called into question whether enrichment metrics had worked; (c) the Porto Alegre Clinic's patients had healthy scores on exactly the metrics Defendants claimed showed the entire trial cohort was sick; and so, therefore, (d) Defendants' statements concealed a serious risk that something was happening at the Porto Alegre Clinic that would throw off PROSERA's results.

190. During the same May 15, 2025, call, Hasnain cited the aggregate number of screened patients as proof that Gossamer had applied PROSERA's entry criteria stringently:

> We screened somewhere in the neighborhood of 750 patients to this study, which is a significant number of patients. And the fact that that's about double what we have actually will end up enrolling . . . should tell you . . . that ***we've been incredibly stringent to our entry criteria into the study*** for all the reasons that we've talked about.

191. The emphasized portion of Hasnain's statement was materially false

and misleading because at the Porto Alegre Clinic, a meaningfully larger proportion of screened candidates passed PROSERA's cumulative entry gates despite other indications that the patients did not have the intended disease burden. Because that Clinic supplied 27 participants, its unusually low screen-failure rate could be masked by rejections elsewhere while still introducing enough noncomparable patients to affect the trial. The undisclosed site-level rate therefore contradicted the inference of uniform screening stringency that Hasnain drew from the aggregate total.

192. During the same call, Hasnain explained why Gossamer expected patients enrolled outside the United States, including South America, to perform especially well:

> ***What we find in those jurisdictions are really excellent patients for us to enroll into this study. And by that, I mean low morbidities and patients that in historical trials from those regions have shown a much larger magnitude of effect on their six-minute walk. . . .*** And that's largely, we believe, because these patients are just more pure PAH patients with less comorbidity and an easier opportunity to show that magnitude of effect.

193. The emphasized portion of Hasnain's statement was materially misleading because it attributed the expected South American advantage to a favorable biological profile—"more pure PAH patients" with fewer comorbidities—and thereby suggested that any larger six-minute-walk effect would reflect greater drug responsiveness. Gossamer had instead concentrated enrollment at the Porto Alegre Clinic to reproduce STELLAR's results, and that Clinic's lower screen-failure rate, discordance between objective biomarker and subjective metrics, new-to-site patients, and effort-dependent endpoint data made Hasnain's statements describing South American patients materially misleading.

194. On May 22, 2025, Giraudo represented Gossamer at the Emerging Growth Conference, where he stated the following:

> ***We are very, very excited that the enrichment strategy we were using to ensure we got patients that would respond to seralutinib at week 24 via six-minute walk were obtained. In fact, we feel very, very confident that we have truly one of the sicker patient populations that's ever been studied in a clinical study in recent years for pulmonary arterial hypertension.***
>
> ***Needless to say, the combination of our enrichment program as well as going to 31 different countries has allowed Gossamer to put its thumb on the scale to assure that we will have a positive study here*** that we'll announce in February of 2026.

195. Giraudo's unqualified statement that the right patients "were obtained" or that Gossamer had "put its thumb on the scale to assure … a positive study" gave the materially misleading impression that Gossamer's enrichment strategy had succeeded, when in fact: (a) PROSERA's largest enrollment site, the Porto Alegre Clinic, had enrolled an exceedingly high number of patients (27); (b) discordance between objective health metrics and subjective and gameable metrics called into question whether enrichment metrics had worked; (c) the Porto Alegre Clinic's patients had healthy scores on exactly the metrics Defendants claimed showed the entire trial cohort was sick; therefore, (d) Defendants' statements concealed a serious risk that something was happening at the Porto Alegre Clinic that would throw off PROSERA's results.

196. On June 16, 2025, Gossamer published a Form 8-K, and attached press release, announcing the completion of enrollment for PROSERA. The press release

stated that:

> Building on insights from the Phase 2 TORREY Study, we focused on selecting a patient population that aligns closely with the study's objectives and is more likely to exhibit a clinically significant benefit in 24 weeks. Given the preliminary baseline characteristics of PROSERA, ***we firmly believe that we have accomplished this patient selection goal***. We are eager to be able to share topline results from this registrational study early next year.

197. Defendants' statements that "we firmly believe that we have accomplished this patient selection goal" materially misleadingly omitted glaring red flags that suggested that the trial design had failed. These are: (a) PROSERA's largest enrollment site, the Porto Alegre Clinic, had enrolled an alarming number of patients (27); (b) discordance between objective health metrics and subjective and gameable metrics called into question whether enrichment metrics had worked; (c) the Porto Alegre Clinic's patients had healthy scores on exactly the metrics Defendants claimed showed the entire trial cohort was sick; and so, therefore, (d) Defendants' statements concealed a serious risk that something was happening at the Porto Alegre Clinic that would throw off PROSERA's results.

198. The same June 16, 2025, press release further stated that "***the patient population enrolled in PROSERA aligns with the target demographic***, as evidenced by the preliminary baseline characteristics."

199. This statement of present fact misleadingly omitted glaring red flags that suggested that the trial design had failed. These are: (a) PROSERA's largest enrollment site, the Porto Alegre Clinic, had enrolled an alarming number of patients (27); (b) discordance between objective health metrics and subjective and gameable metrics called into question whether enrichment metrics had worked; and

(c) the Porto Alegre Clinic's patients had healthy scores on exactly the metrics Defendants claimed showed the entire trial cohort was sick; therefore, (d) Defendants' statements concealed a serious risk that something was happening at the Porto Alegre Clinic that would throw off PROSERA's results.

200. On November 11, 2025, Giraudo represented Gossamer at the Guggenheim Securities 2nd Annual Healthcare Innovation Conference. In his presentation, Giraudo stated:

> We put in a number of entry criteria for the PROSERA study to make sure that we got a patient demographic that performed the best in the TORREY study. You'll recall, in the TORREY study, the primary endpoint was reduction in pulmonary vascular resistance. The secondary endpoint, although not powered, was six-minute walk distance. Those who had a REVEAL score of six or greater or were functional class three were not only statistically significant on PVR in the mid-20s, if you will, but those functional class three patients had an increase statistically significant of six-minute walk distance, about 37 meters.
>
> ***We wanted to get a patient population that looked like that. In fact, we did.***

201. Giraudo's unqualified statement of present fact misleadingly omitted glaring red flags that suggested that the trial design had failed. These are: (a) PROSERA's largest enrollment site, the Porto Alegre Clinic, had enrolled an alarming number of patients (27); (b) discordance between objective health metrics and subjective and gameable metrics called into question whether enrichment metrics had worked; and (c) the Porto Alegre Clinic's patients had healthy scores on exactly the metrics Defendants claimed showed the entire trial cohort was sick;

therefore, (d) Defendants' statements concealed a serious risk that something was happening at the Porto Alegre Clinic that would throw off PROSERA's results.

### D. Additional Facts Further Probative Of Scienter

#### *1. Defendants deliberately decided to focus on the Porto Alegre clinic so they would be familiar with its operations*

202. Defendants believed that the Porto Alegre Clinic had achieved exceptional results in the STELLAR trial.

203. Defendants therefore deliberately focused on the Porto Alegre clinic in an attempt to replicate the results of STELLAR.

204. Defendants selected and favored the Clinic because they believed its patients had generated unusually favorable efficacy results in a different trial and wanted that apparent success reflected in PROSERA.

205. Defendants' strategic commitment to Porto Alegre created operational pressure against neutral oversight. Once Defendants had chosen the Clinic as a means of reproducing favorable precedent, evidence that the Clinic should be capped or slowed threatened both Defendants' scientific thesis and their enrollment timetable.

206. Moreover, Defendants' deliberate decision showed that they scrutinized the site, and were therefore well aware of the red flags that arose throughout the enrollment period. The Porto Alegre Clinic was PROSERA's keystone recruitment center, and Defendants must therefore have been keenly monitoring the Clinic's enrollment process – should the process fail there, it would put the entirety of the study in jeopardy.

207. In addition, Defendants touted the characteristics of Latin American patients in general. They made specific statements about these patients' comorbidities, age, and medications. Their statements showed that they were monitoring the details of enrollment in Latin America, and the Porto Alegre Clinic

made up 25% of PROSERA's Latin American population.

208. The Porto Alegre Clinic recruited 27 patients. It was by far the largest recruiting PROSERA clinic. Not only was the number a red flag, it was also 6.9% of PROSERA's total recruitment. Thus, Defendants were closely watching the Porto Alegre clinic results.

*2. Defendants evinced familiarity with the data underlying the red flags*

209. Defendants repeatedly reported the exact PROSERA baseline results on which the Porto Alegre Clinic was an extreme outlier.

***NT-proBNP scores***

210. Defendants acknowledged that NT-proBNP was a "key" input into REVEAL Lite scores, showing that they were monitoring the metric:

> And we're doing that using what's known as the REVEAL Lite 2 risk score. Recall, in TORREY, we used something called REVEAL 2.0. It was a risk score, REVEAL 2.0. …. In order to make it more operationally feasible in a global study, we're using this abridged version of REVEAL, fully validated, and really which captures the key discriminators. So they're non-invasive measurements. The key ones are 6-minute walk, NT-proBNP. But what importantly it does, it guarantees us that we'll have patients with enough impairment.

211. Defendants treated improvement in NT-proBNP as a key result. For example, on the November 11, 2024 call, Defendant Giraudo stated, as to TORREY:

> So at week 24, I think we had that 14% reduction in PVR, but we had a number of other proofs, if you will, that the drug was doing something very important. Significantly, we saw a meaningful reduction in NT-proBNP, which is a biomarker for right heart health, that was

statistically significant at week 12.

212. Again, discussing PROSERA patient selection at the 2025 Leerink Global Healthcare Conference, Roscigno, by then a Senior Vice President of Clinical Development, stated:

> Importantly, when we looked at the phase II of competitor trials at the time, we had higher six-minute walk at baseline, a lower pulmonary vascular resistance, and again, lower NT-proBNP and BNP. Again, these patients were in general less sick. We know that we need to have impairment to improve impairment.

213. As set out above, in the course of explaining why Gossamer had successfully enriched the patient population, Defendant Hasnain specifically referenced NT-proBNP scores:

> Second, our mean NT-proBNP, which is an important biomarker of heart failure is 96 nanograms per liter in PROSERA [sic - 986] which denotes a materially more severe population than the TORREY study where the mean NT-proBNP levels were only 628 nanograms per liter. For additional reference, sotatercept STELLAR Phase III had a baseline mean NT-proBNP of 1,121 nanogram per liter, nearly double what we enrolled in TORREY and much more similar to what we are seeing in the baseline characteristics of PROSERA."

214. Announcing the full completion of enrollment on June 16, 2025, Defendants again reported the mean NT-proBNP number, which for the full population was 987 ng/L.

215. At the November 11, 2025, Guggenheim 2nd Annual Healthcare Innovation Conference, Defendant Giraudo stated:

> We wanted to get a patient population that looked [sicker]. In fact, we

did. So, in our PROSERA study, as opposed to TORREY which had roughly folks walking six minute walk distance about 408, 409 meters in PROSERA, it's about 370 so meaningfully less. Our NT-proBNP which is as you know is a biomarker of right heart health, the PROSERA studies were about I think 900 versus 600 in TORREY.

216. Moreover, one of the enrichment criteria was NT-proBNP, so patients could qualify based on that alone. As such, Defendants were closely monitoring and would have known about the Porto Alegre Clinic's NT-proBNP scores.

***Screen Failure Rates***

217. On March 11, 2025, Senior VP Roscigno boasted that Gossamer "carr[ied] a fairly high screen failure rate, which is what you want when you're trying to get ideal patients to be able to move at week 24."

218. Roscigno also evinced knowledge of region-specific screen failure rates, claiming that "as we exited the fourth quarter of last year, our screening funnel in the United States had never been larger."

219. Defendants were also aware of screen failure rates and held them up as proof that Defendants had met their goals. At the Q1 2025 earnings call, held May 15, 2025, Defendant Hasnain stated:

> ***As an example and just kind of further highlight that point, Andreas, we screened somewhere in the neighborhood of 750 patients to this study, which is a significant number of patients. And the fact that that's about double what we have actually will end up enrolling. That should tell you 2 things. One, that we've been incredibly stringent to our entry criteria into the study for all the reasons that we've talked about.***

220. Defendants also specifically monitored the patients' baseline

characteristics. At the Piper Sandler 36th Annual Healthcare Conference, asked "And team, what type of data or information are you privy to in PROSERA as you're conducting the study?," Defendant Giraudo stated:

> Certainly, we're watching the baseline characteristics of the patients that are coming into the study. As I said earlier, the enrichment strategy that Rich helped put together to ensure we're getting those sicker patients with really active disease, I would say it's working quite well. We're very pleased with the patients that have been enrolled in the study to date.

*3. Defendants Evinced familiarity with the details of PROSERA*

221. Gossamer's leadership made public statements displaying a keen familiarity with the intricacies of the enrollment considerations, as well as the attendant testing and data collection process.

222. For example, at the September 3, 2025, Cantor Global Healthcare Conference, Giraudo stated that he had "personally visited over 45 [enrollment] sites and done the walk track myself."

223. On the same call, he suggested that he had oversight of even the smallest details of the data collection process:

> Other things, for example, when a patient comes in for their baseline six-minute walk, we're taking a picture of their shoes. What are they wearing? Are they in sneakers and a T-shirt and shorts?
>
> For their week 24, they need to be in possibly the same sneakers and a T-shirt and shorts, not flip-flops and a bulky sweatshirt. ***Down to that level of detail.***

224. Giraudo also boasted of Gossamer's involvement in the trial. In his

September 3, 2025, presentation at the Cantor Global Healthcare Conference, he stated:

> We have 191 sites in PROSERA. A Gossamer employee has visited every single one of those sites multiple times, is working on a very consistent and daily basis with site study coordinators, with nursing staff, with KOLs,[19] with investigators, having a constant in-person daily dialogue.

225. Indeed, as Giraudo told investors at the December 3, 2024 Piper Sandler 36th Annual Healthcare Conference:

> A Gossamer representative has seen every single site multiple times, has seen every single six-minute walk test. So the QA/QC, aside from what we're doing from a patient enrichment, has been very, very robust.

*4. Defendants Had a Financial Motive to Accept the Porto Alegre Clinic's Otherwise Implausible Results*

226. In 2022 and 2023, Gossamer reported losses from operations of $219 million and $184 million, respectively.

227. Before December 2022, Gossamer was able to sell shares at favorable rates. From 2020 to 2022, it sold 26.1 million shares for net proceeds of $237.2 million.

228. But when it disclosed TORREY results in December 2022, its stock price fell by more than 70%. In July 2023, Gossamer raised $212 million, but on unfavorable terms: investors received 129.9 million shares and 32.5 million warrants. At the time, Gossamer only had 95 million shares outstanding. Thus, Gossamer sold 57.6% of itself for just one year's operating capital.

229. By December 31, 2024, Gossamer had current assets of $309.9

---

[19] Key Opinion Leaders.

million. But Gossamer had far less cash than it seemed to have at face value: it owed $197.5 million in long-term convertible senior notes due 2027. In the meantime, interest payments were $10 million annually.

230. Gossamer had survived 2024 through cash infusions from its new partner, Chiesi.

231. In May 2024, Gossamer entered into a strategic collaboration with Chiesi concerning seralutinib. Chiesi paid Gossamer a $160 million nonrefundable development-cost reimbursement. Gossamer also became eligible for up to $146 million in regulatory milestones and $180 million in sales milestones, a 50% share of U.S. profits and losses, escalating ex-U.S. royalties, and development-cost sharing outside PROSERA.

232. In a May 6, 2024, investor call announcing the collaboration, Defendant Hasnain made the purpose of the relationship clear, saying that "this transaction immediately extends runway and mitigates cash burn, putting $160 million in cash on the balance sheet as a clinical development reimbursement."

233. Chiesi entered the transaction only after an extensive diligence process that Defendants said lasted approximately four to five months. Hasnain stated that Chiesi had immersed itself with Gossamer's personnel, accessed the data room, consulted key opinion leaders, and examined PROSERA site initiation and patient enrollment.

234. One of Chiesi's key concerns was site selection in PROSERA. On the call, Defendant Giraudo said Chiesi had followed PROSERA's execution step by step, "from site selection to site initiation to enrollment," and had been "watching very closely." Very little recruitment had occurred by then and the Porto Alegre Clinic had not yet recruited alarming numbers of patients.

235. Satisfied, Chiesi allowed Gossamer to retain the operational lead, and left Gossamer solely responsible for conducting the trial.

236. But Chiesi retained the right to terminate the entire collaboration at will, in its sole discretion, after a contractually specified notice period. Gossamer itself warned investors that termination of the Chiesi collaboration could delay development and commercialization of seralutinib and materially harm Gossamer's business, financial condition, and results of operations.

237. Defendants were therefore motivated to ensure that, as far as Chiesi was concerned, PROSERA was proceeding without a hitch. Should Chiesi learn of the problems at the Porto Alegre Clinic and terminate the contract, Gossamer would be in a precarious position, with its future funding source gone.

238. In sum, Defendants were desperate to prove that they had learned TORREY's lessons and had recruited the correct population for PROSERA. But Chiesi and investors had limited patience. Defendants' false statements about how well they had recruited the PROSERA population helped keep concerns at bay.

239. Moreover, investigating the Porto Alegre Clinic, capping the number of its patients who could participate, or taking some other action before full enrollment was not easily done and would have raised substantial risks.

240. Initiating a cap would have created a documented sponsor intervention, which could lead to various negative effects on the trial, from a conflict with Chiesi all the way to regulatory consequences. Defendants would have had to answer numerous questions, such as why the cap was implemented, whether other sites showed similar issues, how exclusion would affect the study's metrics, and many more. The report would also draw scrutiny to the Porto Alegre Clinic, which Defendants might avoid if the trial proved successful. And it might cause the FDA and Chiesi to question whether the patients who had been enrolled at the time the cap was instituted were appropriate.

241. A cap would also irritate the primary investigator, who might then be unwilling to participate in future Gossamer clinical trials.

242. Thus, even before full enrollment, taking action would impose significant and largely unpredictable costs.

243. Moreover, these options disappeared after full enrollment, and Defendants were then left with few good options. Once patients are randomized and treated, even before unblinding, the sponsor cannot erase them from the record. Rather, the sponsor must report all patients who are treated, including even patients who withdraw from the trial.

244. Defendants gambled that the Porto Alegre Clinic's results would not throw off the trial—or even that the suspicious number of patients it was able to raise would redound to their favor.

245. They lost that bet.

*5. The Fraud Implicated Core Operations*

246. The fraud alleged herein implicates the core operations of Gossamer.

247. Seralutinib was and is Gossamer's only advanced product candidate, and the treatment of PAH was and is its primary indication. As such, PROSERA was the single most important concern for the company at all relevant times, as the 80% decline in Gossamer's stock price when Defendants announced that PROSERA had not met its clinical endpoints shows. PROSERA's success or failure was the critical consideration for Gossamer's investors and for the analysts that covered Gossamer and participated in its quarterly earnings calls.

248. As demonstrated through public statements, appearances, and press releases by Gossamer's leadership leading up to and during PROSERA, enrolling a sufficiently enriched study population was the company's primary concern. On the company's Q1 2025 earnings call, Hasnain claimed that ***"Over the past year and a half, we at Gossamer have dedicated immense time, effort, and hard work to enroll our pivotal PAH study, the phase III PROSERA study."*** He finished his

comment by stating that "***what really matters is enrolling the correct patient population to best position PROSERA for a successful outcome***."

249. Hasnain could not have been any clearer that the composition of the PROSERA study population was the single most important issue for Gossamer's leadership.

250. Moreover, Defendants knew investors were focusing on the PROSERA study population's baseline characteristics. For example, at the September 3, 2025, Cantor Global Healthcare Conference, one analyst told Giraudo and CCO Robert Smith that "we love when companies are very transparent around baseline characteristics. It gives us all in the room a lot more to sink our teeth into."

251. It is therefore absurd to suggest that the Individual Defendants and executive management did not know the facts and circumstances of the alleged fraud. Moreover, such knowledge is imputable to the Individual Defendants, given the implication of core operations, the Individual Defendants' roles and status within Gossamer, the Individual Defendants' specific professional backgrounds, the Individual Defendants' oversight and extensive involvement in Gossamer's clinical trials and product development efforts, and their personal involvement in the key events and circumstances at issue, as otherwise alleged herein.

*6. Gossamer Was a Small Company*

252. Throughout the relevant period, Gossamer was a clinical-stage biopharmaceutical company with no approved products or commercial product revenue. Seralutinib was Gossamer's only product candidate and the principal focus of its business.

253. PROSERA was the registrational Phase 3 trial of seralutinib for pulmonary arterial hypertension. PROSERA's enrollment, site selection, patient screening, endpoint administration, monitoring, and data quality therefore concerned Gossamer's central business operation, not an ancillary program.

254. As of February 27, 2024, Gossamer employed 135 full-time employees and no part-time employees. As of March 6, 2025, while PROSERA was enrolling patients and Defendants were evaluating its blinded baseline data, Gossamer employed 144 full-time employees and one part-time employee.

255. Those totals included all personnel needed to operate a public biotechnology company, including executive management, finance, legal, regulatory affairs, technical operations, administration, business development, and other functions. The employees responsible for clinical development, clinical operations, biostatistics, data management, medical monitoring, site oversight, vendor management, and quality control necessarily comprised only a portion of the Company-wide workforce.

256. Gossamer's scientific workforce was also concentrated. Of the Company's 135 employees in February 2024, 32 held an M.D. or Ph.D. Of its 145 employees in March 2025, 30 held an M.D. or Ph.D. PROSERA was therefore managed within a limited group of specialized employees responsible to a small senior-management team.

257. Gossamer stated that it would continue to lead global development of seralutinib in PAH and would remain solely responsible for conducting PROSERA at its own cost and expense. Enrollment reports, site-performance information, monitoring results, and escalated concerns were therefore matters within Gossamer's own trial-management functions.

258. Defendants publicly demonstrated familiarity with those same subjects. They discussed screened and enrolled patient counts, blinded baseline characteristics, regional enrollment, site visits, six-minute-walk-test procedures, and quality controls. These statements showed that Defendants were not remote from PROSERA's enrollment and site-oversight processes.

259. The Porto Alegre Clinic enrolled approximately 27 of PROSERA's

390 participants, or approximately 6.9% of the pivotal trial. In Gossamer's compact, single-product organization, the Clinic's enrollment concentration and the contemporaneous concerns alleged herein were sufficiently important to support the inference that they were communicated to, known by, or deliberately disregarded by Defendants when Defendants made the challenged statements.

## V. NO SAFE HARBOR

260. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements alleged herein. Most, if not all, of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent any were so labelled, they included statements of then-historical or then-present fact, and there were no accompanying, meaningful, cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Any purported cautionary language warned only of theoretical future risks at times when those risks had already ripened due to Gossamer's then-ongoing misconduct. Moreover, the purported cautionary language failed to adjust over time, using the same theoretical tone even after concrete changes of circumstance.

261. Alternatively, to the extent that the statutory safe harbor does apply to any false or misleading statements pleaded herein that the Court deems to have been forward-looking, Defendants are still liable for those statements because at the time each of them was made, the particular speaker knew that the forward-looking statement was false or misleading and/or the forward-looking statement was authorized and/or approved by an executive officer of Gossamer who knew that those statements were false or misleading when made.

## VI. THE CLAIMS ARE TIMELY

262. The claims set forth herein were timely filed.

263. The market was not arguably aware until February 23, 2026, at the earliest, that PROSERA had seen unusual results in Latin America. Later disclosures specifically identifying the Porto Alegre Clinic and the red flags it raised continued until June 25, 2026.

264. It was also not until February 23, 2026, when Defendants disclosed results, or on June 25, 2026, when they disclosed the last red flag cited herein, that Plaintiffs were first presented with any credible evidence that Defendants had made materially false and misleading statements to investors during the Class Period. In the absence of publicly available information prior to then suggesting that Gossamer's pronouncements in its SEC filings and other public statements during the Class Period were materially false and/or misleading, Lead Plaintiff is not charged with any knowledge that could be discovered in an investigation beginning before February 23, 2026.

265. Plaintiffs' Exchange Act claims against Defendants were brought within two years. Thus, Plaintiffs have complied with the requirements of 28 U.S.C. § 1658(b).

## VII. PRESUMPTION OF RELIANCE

266. At all times, the market for Gossamer shares was an efficient market, supporting a presumption of reliance under the fraud-on-the-market doctrine, for the following reasons, among others:

(a) Gossamer met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient and automated market, under the ticker symbol "GOSS";

(b) Gossamer had approximately 227.32 million shares outstanding as of June 30, 2025, early in the Class Period, such that its stock was liquid. During the Class Period, numerous shares of Gossamer stock were traded on a daily basis, with moderate to heavy volume, demonstrating an active and broad market for Gossamer

stock and permitting a strong presumption of an efficient market;

(c) As a regulated issuer, Gossamer filed periodic public reports with the SEC;

(d) Gossamer regularly communicated with public investors via established market communication mechanisms, including regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e) Gossamer was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period; and

(f) Unexpected material news about Gossamer was rapidly reflected and incorporated into its stock price during the Class Period.

267. As a result of the foregoing, the market for Gossamer stock promptly digested current information regarding Gossamer from all publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all purchasers of Gossamer securities during the Class Period suffered similar injury through their purchase thereof at artificially inflated prices, and a presumption of reliance applies.

268. Alternatively, Plaintiffs and the Class members are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## VIII. PLAINTIFFS' CLASS ACTION ALLEGATIONS

269. Plaintiffs bring this federal securities action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) on behalf of a Class consisting of all persons and

entities, other than Defendants and other excluded parties (identified below), who purchased or otherwise acquired the securities of Gossamer (NASDAQ: GOSS) between May 16, 2025, and February 20, 2026, both dates inclusive, seeking to recover damages caused by Defendants' violations of the U.S. federal securities laws and to pursue remedies under Exchange Act §§10(b) and 20(a) and Rule 10b-5 promulgated thereunder.

270. Excluded from the Class are Defendants, the officers and directors of Gossamer during the Class Period, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

271. The Class members are so numerous that joinder of them all is impracticable. Throughout the Class Period, Gossamer securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other Class members may be identified from records maintained by Gossamer or its transfer agent and may be notified of the pendency of this action by mail or email, using the forms of notice similar to those customarily used in securities class actions.

272. Plaintiffs' claims are typical of the claims of the Class members, as Class members are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

273. Plaintiffs will fairly and adequately protect the Class members' interests, have no interests antagonistic to or in conflict with those of the Class, and have retained counsel competent and experienced in class and securities litigation.

274. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among

the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period materially misrepresented material facts about the business, operations and management of Gossamer;
- whether the Individual Defendants caused Gossamer to issue materially false or misleading statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing materially false or misleading statements;
- whether the prices of Gossamer securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the Class members have sustained damages and, if so, what is the proper measure of damages.

275. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

276. As alleged herein, Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine inasmuch as Defendants made public misrepresentations or failed to disclose material facts during the Class Period; the misrepresentations and omissions were material and would tend to induce a reasonable investor to misjudge the value of Gossamer's securities; and Plaintiffs and the Class members purchased or otherwise acquired Gossamer's securities between the time the Defendants failed to disclose or misrepresented

material facts and the times true and corrective facts were disclosed, without knowledge of the omitted or misrepresented facts.

**COUNT I**

**(Against All Defendants for Violations of**

**§10(b) and Rule 10b-5 Promulgated Thereunder)**

277. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

278. This Count is asserted against Defendants and is based upon Exchange Act §10(b), 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

279. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiffs and the other Class members; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Gossamer securities; and (iii) cause Plaintiffs and the other Class members to purchase or otherwise acquire Gossamer securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions pled herein.

280. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities

analysts and the media that were designed to influence the market for Gossamer securities. Such reports, filings, releases and statements, as alleged herein, were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Gossamer's finances, operations, and business prospects.

281. Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein, including by virtue of their positions at Gossamer, and intended thereby to deceive Plaintiffs and the other Class members, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

282. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. Defendants' first-hand knowledge is alleged herein. Moreover, as the senior managers and/or directors of Gossamer, the Individual Defendants had knowledge of the details of Gossamer's operations, business, and internal affairs.

283. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, they were able to and did, directly or indirectly, control the content of the statements of Gossamer. As officers and directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Gossamer's businesses, operations, financial condition, and prospects. As a result of the dissemination of the aforementioned false and

misleading reports, releases and public statements, the market price of Gossamer securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Gossamer's business and financial condition that were concealed by Defendants, Plaintiffs and the other Class members purchased or otherwise acquired Gossamer securities at artificially inflated prices and relied upon the price of those securities, the integrity of the market for those securities and/or upon statements disseminated by Defendants, and were damaged thereby.

284. During the Class Period, Gossamer securities were traded on an active and efficient market. Plaintiffs and the other Class members, relying on the materially false and misleading statements described herein, which the Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired Gossamer securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other Class members known the truth, they would not have purchased or otherwise acquired said securities or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class members, the true value of Gossamer securities was substantially lower than the prices paid by Plaintiffs and the other Class members. The market price of Gossamer securities declined upon public disclosure of the facts alleged herein to the injury of Plaintiffs and the Class members.

285. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Exchange Act §10(b) and Rule 10b-5 promulgated thereunder.

286. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other Class members suffered damages in connection with their respective purchases, acquisitions, and/or sales of Gossamer's securities during the Class Period, upon the disclosure that Defendants had been disseminating

misrepresented financial and operational reports and information to the investing public.

**COUNT II**

**(Violations of §20(a) of the Exchange Act Against the Individual Defendants)**

287. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

288. During the Class Period, the Individual Defendants oversaw and participated in the operation and management of Gossamer, and conducted and participated, directly and indirectly, in the conduct of Gossamer's business affairs. Because of their senior positions, they knew the adverse non-public information about Gossamer's business, operations, financial condition, results, and prospects, including its clinical trial data, product development efforts, and fundraising activities.

289. As officers and directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Gossamer's business, operations, financial condition, results, and prospects and to correct promptly any public statements issued by Gossamer which had become materially false or misleading.

290. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Gossamer disseminated in the marketplace during the Class Period concerning Gossamer's business, operations, financial condition, results, and prospects. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Gossamer to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Gossamer within the meaning of Exchange

Act §20(a). In their capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of securities.

291. The Individual Defendants, therefore, acted as controlling persons of Gossamer. By reason of their senior management positions and/or being directors of Gossamer, the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Gossamer to engage in the unlawful acts and conduct complained of herein. The Individual Defendants exercised control over the general operations and business of Gossamer and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other Class members complain.

292. By reason of the above conduct, the Individual Defendants are liable pursuant to Exchange Act §20(a) for the violations committed by Gossamer.

## IX. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A. Determining that this action may be maintained as a class action under Fed. R. Civ. P. 23 and certifying Plaintiffs as Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other Class members prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding other and further relief as the Court deems just and proper.

## X. DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: August 10, 2026

Respectfully submitted,

**THE ROSEN LAW FIRM, P. A.**

*/s/ Laurence Rosen*
Laurence M. Rosen (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Jonathan Horne (*pro hac vice)*
Yitzchok Fishbach (*pro hac vice*)
275 Madison Avenue, 40th Fl.
New York, New York 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: jhorne@rosenlegal.com
Email: yfishbach@rosenlegal.com

*Court-appointed Lead Counsel*

## CERTIFICATE OF SERVICE

I, Laurence M. Rosen, hereby declare under penalty of perjury as follows: I am the managing attorney of The Rosen Law Firm, P.A., with offices at 355 South Grand Avenue, Suite 2450, Los Angeles, CA 90071. I am over the age of eighteen.

On August 10, 2026, I electronically filed the following **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** with the Clerk of the Court using the CM/ECF system which sent notification of such filing to counsel of record.

Executed on August 10, 2026.

/s/ Laurence Rosen
Laurence M. Rosen